11 SULLIVAN, Judge.
This ease arises from a head-on automobile collision. The accident occurred on Louisiana Highway 182 near the St. Martin Parish — Iberia Parish' border on April 18, 1994. Highway 182 is a two-lane rural highway with twelve foot wide travel lanes and eight foot wide paved shoulders on each side of the travel portion of the roadway. A railroad track runs parallel to Highway 182 on its western side. On the day of the accident, the weather was clear and sunny, and the roadway was dry.
• Defendant, Mia Zebouni, who was traveling south toward New Iberia from Lafayette, steered her Toyota Camry onto the right shoulder to avoid hitting a cat. Ms. Ze-bouni’s right-side tires then went approxi *442 mately eight to ten inches off of the paved shoulder, and she continued to travel parallel to the highway at about fifty miles 12per hour for seventy-nine feet. When her right tires had traveled sixty-five feet along the unpaved area adjacent to the paved shoulder, the right tires crossed over a six-inch wide culvert headwall that abutted and was flush with the paved shoulder. The headwall is part of a drainage culvert that passes under the highway and facilitates drainage to the ditches alongside the highway. After traveling fourteen more feet with her car’s right tires on unpaved ground, Ms. Zebouni’s car moved to the left, crossing the paved shoulder and southbound lane. Ms. Zebouni’s car then crossed the highway center line and struck the Ford Bronco II driven by plaintiff, Traci Allen Netecke. The point of the collision was four feet, nine inches from the center line in Ms. Netecke’s lane. The Bronco then veered to the right, crossed the paved shoulder adjacent to the northbound lane, and landed in a ditch adjacent to a private driveway.
Ms. Netecke was seriously injured in the accident. She suffered a severe closed head injury, multiple bilateral open tibia-fibula fractures, multiple bilateral pelvic fractures, multiple transverse processes fractures, a mandible fracture, liver lacerations, a superficial hematoma of the sac overlying the pancreas and a lacerated small bowel mesentery. Mentally, her closed head injury caused confusion, agitation, severe short-term memory loss, organic hallucinosis, delusional disorder, delirium, amnesia, and emotional and behavioral problems. She was treated initially at Our Lady of Lourdes Hospital in Lafayette for three days. She was then.transferred to Methodist Hospital in Houston, Texas, where she was treated for approximately one month. There, Ms. Netecke underwent numerous orthopedic surgeries to repair her fractured lower extremities. She also developed an inability to urinate, requiring sterile catheterization every four to six horn’s.
She was then released from Methodist Hospital and admitted to The Institute for Rehabilitation and Research (TIRR) in Houston, where her recovery continued for 13three months. She developed osteomyelitis, a bone infection, in her left lower leg requiring surgery to remove the resulting dead tissue. She also underwent several other surgeries while at TIRR. Ms. Netecke had to return to the hospital for more surgeries in September and November of 1994 and, in February of 1995, had an intramedullary nail removed from her left tibia due to infection.
In July, 1996, Ms. Netecke had her left leg amputated below the knee due to the persistent infection. A second revision of the amputation was required in September 1996.
During the time that Ms. Netecke was not in the hospital, she was taken care of by her parents, William and Barbara Allen. At the time of trial, they were sixty-eight and sixty-five years old, respectively.
Ms. Netecke, a Texas resident, and her alleged common-law husband, Michael Ne-tecke, sued Ms. Zebouni; National Union Fire Insurance Company, Ms. Zebouni’s liability insurer; Patterson Insurance Company, Ms. Netecke’s uninsured motorist carrier; and the State of Louisiana, through the Department of Transportation and Development (DOTD). The Neteckes asserted DOTD was negligent and/or strictly liable for placing the open box culvert at the edge of the paved shoulder and -within the “usable shoulder” of the highway. National Union and Patterson paid their policy limits of $25,000.00 and $10,-000.00, respectively, into the registry of the court and were dismissed from the litigation.
Aetna Health Plans and its subsidiary, Guardian Life Insurance Company, intervened in the suit to recover amounts paid for Ms. Neteeke’s medical care.
Before trial, Ms. Zebouni filed an exception of no right of action against Mr. Ne-tecke. She asserted that he failed to prove that he and Ms. Netecke had contracted a valid common-law marriage under the laws of the State of Texas. The |4trial court granted the exception and dismissed Mr. Netecke’s consortium claim. He has separately appealed. The merits of Mr. Neteeke’s appeal are dealt with in a separate opinion bearing docket number 97-1516.
The case proceeded to trial with the remaining defendants, Ms. Zebouni and DOTD. At the close of trial, the jury determined that *443 DOTD was “negligent and/or strictly liable” and that Ms. Zebouni was negligent. The jury apportioned ninety-eight percent of the fault to DOTD and two percent to Ms. Ze-bouni. It awarded Ms. Netecke $644,200.34 in past medical expenses and $5,000,000.00 in future medical expenses. Additionally, the jury awarded $400,000.00 for past, present, and future physical pain and suffering, $400,-000.00 for past, present, and future mental pain and suffering, and $400,000.00 for loss of enjoyment of life. The trial court signed a judgment in accordance with the jury verdict on November 11, 1996. Therein, the trial court also awarded judgment in favor of Aet-na and Guardian Life for $548,088.33 and $20,844.59, respectively. These amounts were awarded for reimbursement of medical expenses paid by the insurers, which were ordered to be paid from Ms. Neteeke’s past medical expenses award.
DOTD moved for judgment notwithstanding the verdict (JNOV) on the issues of its liability, fault apportionment, and the propriety of the judgment in favor of Aetna and Guardian Life on their intervention claims. The trial court ruled in favor of DOTD on the insurers’ intervention claims, finding that they had failed to sufficiently prove their respective rights to recover under their insurance policies. The trial court signed a judgment denying the intervention claims and a second amended judgment that included the taxing of costs.
DOTD appealed and maintained the trial court erred by:
(1) finding DOTD liable,
15(2) assessing Ms. Zebouni with two percent fault,
(3) accepting the testimony of plaintiffs experts,
(4) failing to properly balance the risk versus the utility of. the drainage structure,
(5) awarding excessive future medical expenses and excessive general damages, and
(6) excluding testimony relating to the source of payment of Ms. Netecke’s past medical expenses.
Ms. Netecke answered the appeal, seeking an increase in the general damage awards that she argues are inadequate.
For the following reasons, we conclude that the jury manifestly erred in apportioning to Ms. Zebouni only two percent of the fault for the.harm caused to Ms. Netecke. We raise Ms. Zebouni’s level of fault to fifty percent, the lowest point reasonably within the jury’s discretion. Because we raise Ms. Zebouni’s comparative fault, we necessarily lower DOTD’s fault to fifty percent. We also conclude that the jury abused its discretion in awarding Ms. Netecke an inadequate amount for her loss of enjoyment of life. We increase that element of general damages to $1,500,000.00. In all other respects, we affirm the trial court’s judgment.
LIABILITY OF DOTD AND MS. ZEBOUNI
Because DOTD’s first four assignments of error are interrelated, we will analyze these assignments together. These assignments concern the finding of liability, comparative fault, the acceptance of plaintiffs experts’ testimony regarding DOTD’s liability, and the required risk-utility balance.
DOTD has a duty to maintain the roadways and shoulders of the highways it controls in a reasonably safe condition for automotive travel. DOTD also must maintain the area off the shoulder but within its right of way in a condition such that | ¿t does not pose an unreasonable risk of harm to motorists using the adjoining highway or to others using the area in a reasonable manner. Oster v. Department of Tmnsp. & Dev., State of Louisiana, 582 So.2d 1285 (La.1991). This “duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder.” Brown v. Louisiana Indem. Co., 97-1344, p. 4 (La.3/4/98); 707 So.2d 1240, 1242. To prove DOTD is liable, a claimant must show that “1) the thing which caused the damage was in the custody of the defendant; 2) the thing contained a ‘defect’ (i.e., it had a condition that created an unreasonable risk of harm to the plaintiff); and 3) the ‘defective’ condition *444 of the thing caused the plaintiff’s injuries.” Oster, 582 So.2d at 1288. To determine if a thing presents an unreasonable risk of harm, the trier of fact must balance the thing’s utility against the likelihood and magnitude of the risk in addition to numerous social, moral, and economic factors such as defendant’s cost of avoiding the risk and the social utility of the injured party’s conduct at the time of the accident. Morell v. City of Breaux Bridge, 94-1378 (La.App. 3 Cir. 5/31/95); 660 So.2d 882, writ denied, 95-2608 (La.1/12/96); 666 So.2d 321. This criteria is not to be mechanically applied. It is designed to serve as a guide to the trier of fact in evaluating a potentially defective condition and its risks. McBride v. Cracker Barrel Stores, Inc., 94-370 (La.App. 3 Cir. 11/2/94); 649 So.2d 465.
The finding of the jury or trial judge on the ultimate determination of unreasonable risk of harm is subject to the manifest error standard of review. The fact finder’s determination is accorded deference and may not be disturbed absent a finding that the determination was clearly wrong or manifestly erroneous. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98); 708 So.2d 362. Under this standard, if two reasonable and permissible views of the evidence exist, and the fact finder’s choice is |7based on reasonable credibility evaluations and factual inferences in light of the entire record, the appellate court cannot reverse even if it would have, as trier of fact, weighed the evidence differently and reached a different result. Stobart v. State, Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993).
At trial, Ms. Netecke’s theory of liability vis-a-vis DOTD was that DOTD’s failure to move the open drainage culvert four to six feet away from its position adjoining the paved shoulder presented an unreasonable risk of harm to Ms. Zebouni. Ms. Netecke asserted that Ms. Zebouni was using the paved and unpaved shoulders in a reasonable manner and steered left to avoid an “embankment” that was the area in front of and surrounding the open culvert. In her effort to avoid the alleged defect, Ms. Zebouni ov-ersteered and struck Ms. Netecke’s vehicle.
Because of her cognitive deficits and memory loss concerning the accident, Ms. Ne-tecke did not testify at trial. Ms. Zebouni testified that, as she steered right onto the shoulder to avoid the cat, she suddenly saw an embankment parallel to her windshield coming toward her car. She said her car was parallel to the highway and that she maintained control. She did not apply her brakes but did release her foot from the accelerator. Ms. Zebouni stated that she did not see the culvert. She described the embankment she perceived as brown in color, but could not identify the embankment in pictures taken on the day of the accident by the investigating state trooper. She said that she feared that, if she did not steer to the left, her car would have crashed into the embankment.
Plaintiff’s accident reconstruction expert, James Lock, testified that, from the moment Ms. Zebouni’s right tires left the paved shoulder until their re-entry past the culvert, approximately one second passed. He concluded that the embankment Ms. Zebouni perceived was the brown grassy area around the culvert that DOTD had Igsprayed with herbicide. He stated her loss of control was caused by her perception of this embankment as a dangerous obstacle and her left steering input reaction to the danger, causing her car to rotate leftward onto the highway at a sharp angle. Mr. Lock said that, without the presence of the culvert, Ms. Zebouni would have had no reason to steer left. On cross-examination, Mr. Lock stated that the concrete culvert headwall, which Ms. Zebouni’s right tires rolled over, is four feet long. He admitted that, other than the fact that the tires rolled directly over the headwall, the drainage culvert played no role in physically causing the accident. He said Ms. Zebouni’s car traveled to the left after it passed over the headwall as a result of her steering to the left. He also stated that, had Ms. Zebouni not steered to the left after crossing the headwall, her car would not have impacted an embankment. Mr. Lock also said that, although Ms. Zebouni’s car turned left after the culvert, she decided to do so and initiated the steering maneuver before crossing the headwall.
*445 Plaintiffs expert in highway and roadside safety, Maurice Bronstad, testified that the area adjacent to the paved shoulder onto which Ms. Zebouni’s right tires traversed is considered usable shoulder because it is relatively flat and can be used for emergencies. In Mr. Bronstad’s opinion, the open culvert constituted a roadside hazard since its opening encroached within the approximately two to three feet -wide usable but unpaved shoulder. He stated that, when this particular portion of Highway 182 was overlayed and the shoulders were paved in 1987 pursuant to Project 4-03-08, DOTD should have moved the drainage structure to a position outside the usable shoulder. He explained that, in the Iberia Parish portion of the overlay, Project 4-04-20, DOTD moved several such headwalls back away from the paved and usable shoulder. On cross-examination, Mr. Bronstad stated that the American Association of State Highway Traffic Officials (AASHTO) and Federal Highway Administration literature |9he relied upon constitute recommendations, not requirements, in the context of rural state highway “3R” (resurfacing, restoration, and rehabilitation) projects. He also conceded that Ms. Zebouni’s car physically contacting the culvert headwall probably did not play a role in causing the accident.
DOTD presented the testimony of Teddy Babin, the project and design engineer on Projects 4-03-08 and 4-04-20. He was accepted as an expert in highway design, limited to DOTD standards. Mr. Babin stated that, in overlaying the highway and paving the shoulders, he followed DOTD rules to limit the work to the crown width of the roadway, which he explained to be the area of relatively flat surface before the ditch foreslope. He said that, although the edge of the crown is not necessarily the same point as the edge of the paved surface, with the 4-03-08 project, the two points coincided. He explained that DOTD design criteria for 3R projects required him to ignore any roadside safety issues beyond the highway crown, within reason. Mr. Babin said he extended six culverts in Project 4-04-20, as depicted in the photographs on plaintiffs exhibits thirty-six and thirty-seven, ■ because at their locations in Iberia Parish, the six culverts were initially within the crown of the highway. These six culverts were extended from between four and five feet each. He stated that the culvert in question is located just outside the highway crown and is within the ditch’s foreslope. On cross-examination, Mr. Babin stated that DOTD does do work outside the highway crown, such as driveway transitions and bridge guard rails, on its 3R projects. He also conceded that, if bridge end rails, mailboxes, and non-breakaway signs were located in the same position as the culvert hole, outside the crown, then DOTD would move these obstacles as part of a 3R project.
Richard Savoie also testified for DOTD as an expert in highway design. Mr. Savoie was not involved in the 3R project for Highway 182. He stated the purpose hoof the highway crown is to facilitate water runoff. He explained that the culvert in question could not be moved back from the paved shoulder because the DOTD right-of-way directly adjoins the railroad right-of-way. He said that there was not enough space to move the headwall and wingwalls without encroaching onto the railroad right-of-way. To achieve the result desired by plaintiff in compliance with AASHTO “clear zone” concepts, Mr. Savoie stated the entire highway would have to be moved at a cost of up to $750,-000.00 per mile. On cross-examination, Mr. Savoie stated that the culvert could have been extended out six and one-half feet from both sides of the highway at a cost of $2,789.00 in “1987 dollars.” This figure only involved cost of construction and not right-of-way acquisition.
DOTD also presented the testimony of Jeff Milbum, a civil engineer accepted by the trial court as an expert in accident reconstruction, highway design, and traffic engineering. He first went to the accident scene in August 1996. He stated that the drainage structure headwall, located nine- feet and five inches from the travel lane, is not a dangerous condition. Mr. Milburn explained that the paved shoulder is intended for emergency use and that DOTD did not intend for motorists to travel beyond the paved shoulder. He concluded that Ms. Zebouni’s actions were the cause of the accident and resulting harm. *446 He stated that Ms. Zebouni perceived something, decided steering was necessary, decided the direction to steer, took physical action to steer, then the car moved in the chosen direction. He explained that the perception and decision phases took at least three-quarters of a second, her perception of the alleged embankment began sixty to seventy feet before the culvert, and she began steering just before the car encountered the culvert headwall. Mr. Milburn disagreed with Mr. Bronstad’s opinion that three feet of usable shoulder lay beyond the paved shoulder.
| nApplying the aforestated legal principles to the testimony and evidence, we conclude that the jury did not manifestly err in finding DOTD liable. The jury was presented with two permissible views of the evidence: (1) that, despite the utility of the culvert for drainage, the culvert’s position within the crown and the surrounding area constituted a defect presenting an unreasonable risk of harm to Ms. Zebouni, from which she steered left to avoid impacting, and this defect caused Ms. Netecke’s injuries, or (2) that the culvert was not within the crown and was not a defect presenting an unreasonable risk of harm. The jury chose to believe the former view' and reasonably could have decided that the cost to DOTD of remedying the defect, by obtaining rights-of-way and extending the culvert, was outweighed by the likelihood and magnitude of the risk encountered by Ms. Zebouni. The evidence and expert testimony were in conflict on this issue. In Hi-Tech Timber Co. Inc. v. Valley Electric Membership Corp., 94-1033, p. 12 (La.App. 3 Cir. 2/1/95); 649 So.2d 1203,1209-10, writ denied, 95-0568 (La.4/21/95); 653 So.2d 571, this court stated:
The jury has much discretion in the evaluation of the weight given to the testimony of expert witnesses. Grady. Roper Drilling v. Transcontinental, 586 So.2d . 707 (La.App. 3d Cir.1991), writ denied, 590 . So.2d 592 (1992). The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. Durkee v. City of Shreveport, 587 So.2d 722 (La. App. 2d Cir.), writ denied, 590 So.2d 68 (1991). In weighing expert opinions, the trier of fact should consider the education and experience of the expert in the particular science or field, the reasons given in support of the opinion, and the other evidence which supports or detracts therefrom. Whittle v. Miller Elec. Mfg. Co., 507 So.2d 266 (La.App. 3d Cir.1987).
We cannot say that the jury abused its discretion in crediting the testimony of Ms. Neteeke’s experts over those of DOTD. Likewise, when reviewed in light of the entire record, we conclude that the jury’s determination that the drainage structure presented an unreasonable risk of harm is not manifestly erroneous.
| ^The jury also found Ms. Zebouni to be at fault and apportioned fault ninety-eight percent to DOTD and two percent to Ms. Ze-bouni. DOTD asserts that the apportionment of fault was erroneous. In Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967, 973-74 (La.1985), the supreme court explained the fact finder’s role in fault apportionment as follows:
[W]e have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor; whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm. *447 to the plaintiff are considerations in determining the relative fault of the parties.
(Footnote omitted.)
The trier of fact is owed deference in its fault allocation since this is a factual determination. If an appellate court finds that an apportionment of fault is clearly wrong, the apportionment should be adjusted to the highest or lowest point reasonably within the trial court’s discretion. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607.
A driver has the duty to use reasonable care in the operation and control of her vehicle. Brown, 707 So.2d 1240. Militating in favor of Ms. Zebouni is the sudden emergency doctrine, since she claims to have been avoiding a eat that was crossing her path and then avoiding the embankment near the culvert. In Coleman v. State, |13 Through Department of Transportation & Development, 524 So.2d 1281, 1285 (La.App. 3 Cir. 1988), we explained the doctrine as follows:
The sudden emergency doctrine is available to a person who finds himself in a position of imminent peril and does not have sufficient time to consider and weigh all of the best means available to avoid that impending danger. Such a person is not guilty of negligence if he fails to adopt what subsequently and upon reflection may have been a better means to avoid the peril. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (La.1972). The doctrine cannot be invoked by one who has brought the emergency on himself by his own wrong or who has not used due care to avoid it. Dick v. Phillips, 253 La. 366, 218 So.2d 299 (La.1969).
On the other hand, when a driver leaves his lane of travel and strikes another vehicle in another lane, a presumption of negligence arises. The burden of proof is on the defendant to “show that he was not guilty of any dereliction, however slight.” Shephard v. Scheeler, 96-1690, p. 18 (La.10/21/97); 701 So.2d 1308, 1318. We discern that, in attempting to exculpate herself from this presumption, the offending defendant can rely on the sudden emergency doctrine.
We agree with the jury that Ms. Zebouni was negligent. However, the jury erred in assigning her only two percent of the fault. She was faced with a sudden, albeit small, emergency when she saw the eat entering her lane. Clearly, she did not find herself in a “position of imminent peril” at that point. To avoid hitting the eat, she steered to the right outside of her twelve foot wide travel lane and onto and partially beyond the eight foot wide paved shoulder. She executed this maneuver, without braking, in a car that measured no greater than six feet wide. She continued to travel along the edge of the shoulder for seventy-nine feet without braking, then oversteered to the left to avoid what she perceived to be an embankment coming toward her car. Her fault was clearly the result of her action or lack of action in failing to stop or slow to a reasonable speed when her car went off the paved shoulder. She was admittedly | ^aware that her right tires were off of the pavement. Her actions were the sine qua non of this accident. Had she continued in her lane of travel, or along the edge of the shoulder without steering left, she would not have hit the embankment, this accident would not have occurred, and Ms. Netecke would have been caused no harm. The risk created by her conduct was great, and she had the capacity to minimize this risk by slowing down further, stopping on the shoulder, or not swerving so far to the right in the first place. Clearly the eight-foot wide paved shoulder provided adequate space to avoid the cat and not put Ms. Zebouni in danger of impacting the embankment.
In Coleman, 524 So.2d 1281, we found that a motorist who was attempting to pass two vehicles was not negligent in going off the left shoulder when the middle car also attempted to pass the lead car. However, we determined that the following motorist was negligent for not slowing down on the shoulder and attempting to re-enter the road without first regaining control. The following motorist was assessed forty percent of the fault.
In the case sub judice, we conclude Ms. Zebouni’s fault, when compared to DOTD’s fault, was, within the fact finder’s discretion, fifty percent at the least. We, therefore, *448 raise her fault to fifty percent and lower DOTD’s fault to fifty percent.
FUTURE MEDICAL EXPENSES
Future medical expenses are an element of special damages that must be proven with certainty based on medical testimony concerning the requirement of such expenses and their probable cost. Revel v. Snow, 95-462 (La.App. 3 Cir. 11/2/95); 664 So.2d 655, writ denied, 95-2820 (La.2/2/96); 666 So.2d 1084.
The jury awarded Ms, Netecke $5,000,000.00. Both Ms. Netecke and DOTD presented experts who had prepared life care plans and economists that testified to the present value of the cost of future care under the respective life care plans. | lsMs. Ne-tecke’s expert, Dr. Robert Voogt, testified that Ms. Netecke should undergo intensive inpatient rehabilitation at a rehabilitation facility for twelve to eighteen months. Thereafter, Dr. Voogt’s plan provided that she would live in her own home with twenty-four-hour care provided by a paraprofessional, have follow-up therapy and intermittent doctor visits. Dr. Voogt opined that such a plan would provide Ms. Netecke the best possible quality of life. Dr. Randy Rice, an economist, testified that the present value of the costs proposed by Dr. Voogt was $5,221,-820.00.
DOTD’s expert, Terry Arnold, R.N., provided a plan to have Ms. Netecke spend the rest of her life in a long-term care facility at a cost of $150.00 to $200.00 per day. Initially, Ms. Netecke would be in a rehabilitation program for twelve months at $350.00 to $400.00 per day. She suggested thé Tan-gram facility in San Marcos, Texas. Dan Cliffe, a certified public accountant, testified that the present value of Ms. Arnold’s plan was between $1,657,938.00 and $2,623,082.00.
The jury had two choices, intensive rehabilitation then home-based care or facility based care. We find no error in the jury determination. Dr. Voogt testified at length about his proposed life care plan and gave adequate reasons for the necessity and costs of its elements. We affirm the jury’s award of future medical expenses.
GENERAL DAMAGES
The jury awarded $400,000.00 each for physical pain and suffering, mental pain and suffering, and loss of enjoyment of life. DOTD maintains the award is excessive. Ms. Netecke asserts the first two elements should be raised to $1,000,000.00 each and the third to $2,000,000.00.
The jury’s discretion in awarding general damages is vast; an appellate court should only in rare instances disturb a general damages award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510. U.S. 1114, 114 S.Ct. |16 1059, 127 L.Ed.2d 379 (1994). “The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular .injured person is a clear abuse of the ‘much discretion’ of the trier of fact.” Id. at 1260. If so, then the appellate court may look to prior awards for guidance in determining the highest (or lowest) point within the trier of fact’s discretion. Id.'
We conclude that the jury abused its discretion in awarding an inadequate amount for Ms. Neteeke’s loss of enjoyment of life. Prior to the accident, Ms. Netecke was a healthy and lucid person who was outgoing and loved the outdoors and animals. She had lived in Alaska from 1982 to 1992 and had a cougar, blue foxes, and exotic chickens for pets. For the remainder of her life, she will have severe cognitive deficits and is an amputee facing a third amputation of her left leg, which, at the time of trial, still was infected. Additionally, she has to be catheterized every four to six hours to urinate and requires help to accomplish this procedure. Even if she reaches her fullest potential through rehabilitation, which is doubtful at best, she will still remain a shell of her former self with substantial limitations on her ability to enjoy her life on a daily basis. Her life expectancy is over forty-five years. We conclude that $1,500,000.00 is the lowest reasonable amount within the fact finder’s discretion to compensate Ms. Netecke for her loss of enjoyment of life. The other two elements of general damages are not an abuse of discretion.
*449 COLLATERAL SOURCE
DOTD next complains that the trial court erred in refusing to allow it to present evidence of the source of Ms. Netecke’s past medical expense payments. Such evidence would violate the collateral source rule, which prohibits a tortfeasor from benefiting and the plaintiffs recovery from being diminished by benefits plaintiff ^received independent of the tortfeasor’s contribution. Francis v. Brown, 95-1241 (La.App. 3 Cir. 3/20/96); 671 So.2d 1041. The trial court did not err in this regard.
JURY INSTRUCTIONS
In brief, DOTD argues that the trial court’s general jury instructions unfairly singled out DOTD. It also maintains that the trial court erred in not including its proposed charges numbers four, nine, and ten in the instructions. However, DOTD did not assign this as error in its motion for appeal or in its assignments listed in the brief. For this reason, we will not address this argued but unassigned error, which is considered abandoned. See Remn Const. Corp. v. Keating, 478 So.2d 207 (La.App. 3 Cir.1985).
DECREE
We amend the judgment rendered in favor of Traci Allen Netecke and against DOTD and Mia Zebouni to $7,944,200.00 plus interest from date of demand. We also amend the judgment to reapportion fault fifty percent to DOTD and fifty percent to Ms. Ze-bouni. In all other respects, we affirm.
Costs of this appeal are to be borne one-third by DOTD, one-third by Mia Zebouni and one-third by Traci Allen Netecke.
AMENDED IN PART; AFFIRMED IN PART; RENDERED.