747 So.2d 489 (1999)
Traci Allen NETECKE, et al.
v.
STATE of Louisiana, Through DOTD, et al.
Nos. 98-C-1182, 98-C-1197.
Supreme Court of Louisiana.
October 19, 1999.
Rehearing Denied November 19, 1999.
*491 David Kelly Balfour, Lafayette, Richard P. Ieyoub, Atty. Gen., Timothy Alan Maragos, Lafayette, Counsel for Applicant in No. 99-C-1182.
Michael Joseph Juneau, Sue Nations, Lafayette, Charles William Roberts, Baton Rouge, Edward O. Taulbee, IV, Lafayette, Debra Keigh Basile, Opelousas, Counsel for Respondent in No. 99-C-1182.
Charles William Roberts, Baton Rouge, Edward O. Taulbee, IV, Lafayette, Counsel for Applicant in No. 98-C-1197.
David Kelly Balfour, Lafayette, Richard P. Ieyoub, Atty. Gen., Timothy Alan Maragos, Lafayette, Debra Keigh Basile, Michael Joseph Juneau, Sue Nations, Lafayette, Counsel for Respondent in No. 98-C-1197.
KNOLL, Justice.[*]
This case is before us on consolidated writ applications filed by the plaintiff, Traci Netecke ("Ms. Netecke"), who was severely injured in a two-vehicle, head-on collision, and one of the defendants, Department of Transportation and Development ("DOTD"), to review the correctness of the court of appeal's judgment. After a careful and thorough review of the record, the testimony, and the evidence presented, we conclude that the lower courts erred in finding DOTD negligent and/or strictly liable for a defective road condition that did not create an unreasonable risk of harm and reverse. We find that the record evidence clearly establishes that the sole legal cause of this accident was Mia Zebouni's ("Ms. Zebouni") negligent operation of her vehicle and assign one-hundred percent fault to her.[1]

FACTS
On April 18, 1994, Ms. Netecke was involved in a head-on collision on Louisiana Highway 182 ("La. Hwy. 182") near the St. Martin Parish/Iberia Parish border. La. Hwy. 182 is a two-lane rural highway with twelve-foot wide travel lanes and eight-foot wide paved shoulders. A railroad track runs parallel on the western side of the highway and sits atop an embankment. At approximately 1:05 p.m., Ms. Zebouni was traveling on La. Hwy. 182 at fifty-five miles per hour to work from Lafayette to New Iberia. It was a clear and sunny day, and the highway was dry. As Ms. Zebouni was driving, she claimed to notice a cat *492 crossing from the opposite lane of traffic toward her lane. In an effort to avoid hitting it, Ms. Zebouni intentionally steered her car to the right and onto the paved shoulder. While attempting this avoidance maneuver, Ms. Zebouni never used her brakes to stop or slow her vehicle. Instead, Ms. Zebouni testified that she lifted her foot off the accelerator to reduce her vehicle's speed. Once on the shoulder, she continued to steer the right side tires of her vehicle off the paved shoulder approximately eight to ten inches and onto an unpaved grassy area adjacent to the paved shoulder.
She continued traveling parallel to the highway in a straight line with her right tires in the grassy area for sixty-five feet at which point her right tires drove over a six-inch wide culvert headwall that abutted and was flush with the paved shoulder.[2] After driving over the headwall, Ms. Zebouni's vehicle traveled fourteen feet further. At some point while in the grassy area, she oversteered her vehicle sharply to the left causing it to yaw and reenter the paved shoulder at a sharp angle.[3] Her vehicle continued back into her travel lane, crossed the center line and collide into Ms. Netecke's vehicle. Expert testimony and physical evidence at the scene of the accident established that from the time Ms. Zebouni's right tires first left the paved shoulder until the point they reentered, her vehicle traveled a total distance of seventy-nine feet in about one second.
In her statement at the scene of the accident, Ms. Zebouni told State Trooper Thibodeaux, the investigating officer, that a cat came onto the road in front of her; that she intentionally drove onto the right shoulder to miss the cat; that she then realized she had traveled too far right as her vehicle went off the paved section of the shoulder; and that when she attempted to correct her error by steering left, her vehicle went out of control. Trooper Thibodeaux testified that Ms. Zebouni recited to him the same story at the scene of the accident and at the hospital. Eyewitnesses to the accident told state troopers that Ms. Zebouni was traveling east on La. Hwy. 182 when she swerved off the road and then cut across the center line, hitting Ms. Netecke. In her deposition and trial testimonies, Ms. Zebouni, for the first time, claimed to have suddenly observed a brown "embankment" coming parallel to her windshield while driving in the grassy area, and, fearing catastrophic injury, steered sharply left and lost control of her vehicle. It is undisputed that Ms. Zebouni's vehicle began moving back to the left only after it had passed over the headwall and that the headwall and drainage culvert played no physical role in causing the accident. Or stated another way, it was her perception of a brown "embankment" that caused her to oversteer her car and that the headwall and drainage culvert did not catapult her car back onto the roadway. Ms. Zebouni also admitted that she failed to see the vertical black and yellow striped warning delimitator that clearly marked the drainage culvert or the culvert itself.
Ms. Zebouni could not identify the "embankment" she claimed to be avoiding from pictures taken the day of the accident or afterwards, and she could not identify the "embankment" when she visited the accident site about a year later. Moreover, the detailed accident report, prepared by Trooper Thibodeaux the day of the accident from interviews with Ms. Zebouni and eyewitnesses and from the physical evidence, is silent as to any "embankment." She admitted that it was possible that she did not mention the "embankment" to the investigating state troopers.
She described the perceived "embankment" as brown in color and admitted *493 seeing other areas brown in color along the roadside. Ms. Zebouni also testified that as she was driving down the road she perceived the ditch in the area beyond the paved shoulder and the railroad sitting atop a real embankment. Ms. Zebouni was issued a citation for careless operation of her vehicle by failing to keep her car on the roadway, losing control of her vehicle, and colliding with another vehicle.

PROCEDURAL HISTORY
As a result of this accident, Ms. Netecke suffered severe and disabling injuries.[4] Ms. Netecke, a Texas resident, sued DOTD asserting it was negligent and/or strictly liable for placing the culvert at the edge of the paved shoulder and within the useable shoulder of La. Hwy. 182. Ms. Netecke also named as defendants Ms. Zebouni; National Union Fire Insurance Co., Ms. Zebouni's liability insurer; and Patterson Insurance Co., Ms. Netecke's uninsured motorist carrier.[5] Patterson Insurance and National Union paid their policy limits into the registry of the court and were dismissed from the suit. Mr. Netecke's employer's heath care insurers, Aetna Health Plans and Guardian Life Insurance Co., intervened in the suit to recover medical expenses paid for Ms. Netecke's care.
A jury trial resulted in a verdict in favor of Ms. Netecke and against DOTD finding it negligent and/or strictly liable and against Ms. Zebouni finding her negligent. The jury apportioned ninety-eight percent fault to DOTD and two percent fault to Ms. Zebouni. The jury awarded Ms. Netecke $644,200.34 in past medical expenses; $5,000,000 in future medical expenses; $400,000 in past, present, and future physical pain and suffering; $400,000 in past, present, and future mental pain and suffering; and $400,000 in loss of enjoyment of life. From the past medical expenses award, the court awarded Aetna $548,088.33 and Guardian Life $20,844.59.
DOTD moved for a judgment notwithstanding the verdict on the issues of liability, apportionment of fault, and the intervention claims. The trial court denied DOTD's motion regarding liability and fault; however, the court ruled in favor of DOTD on Aetna and Guardian Life's intervention claims finding that the insurers had failed to prove their right to recover under their respective insurance policies.
On appeal, the Third Circuit Court of Appeal affirmed the jury's verdict finding DOTD negligent and/or strictly liable, concluding that the culvert presented an unreasonable risk of harm and was a substantial factor in causing the accident. The appellate court also concluded that $5,000,000 for future medial expenses was not an abuse of the jury's discretion. However, the court of appeal concluded that the jury manifestly erred in apportioning Ms. Zebouni only two percent fault and raised her fault to fifty percent, finding that to be the lowest point reasonably within the jury's discretion. The appellate court also concluded that the jury abused its discretion in awarding Ms. Netecke $400,000 for loss of enjoyment of life, finding the award inadequate and increased it to $1,500,000, finding that to be the lowest amount reasonably within the jury's discretion. Netecke, 715 So.2d at 448. We granted Ms. Netecke and DOTD's writ applications to review the correctness of the lower courts' decisions. Netecke v. State, Through DOTD, 98-1182 c/w 98-1197 (La.6/26/98), 719 So.2d 485.
*494 Ms. Netecke's sole assignment of error is that the court of appeal erred in reallocating fault fifty-fifty, arguing that the jury's verdict was reasonable and supported by the record.[6] Ms. Netecke argues that the "embankment" presented an unreasonable risk of harm. She reasons that had the culvert been extended away from the shoulder during the 1987 overlay project, Ms. Zebouni would not have encountered it, perceived it as a hazard, oversteered her vehicle, and collided with Ms. Netecke. Plaintiff reasons that DOTD is liable for causing this accident when one balances the likelihood that drivers would encounter the culvert on the edge of the paved shoulder and that a paved shoulder would increase the frequency and speed of its use, against the magnitude that this open culvert presented in seriously harming a motorist if struck, the case at which DOTD could have moved the culvert at a minimal cost, the fact that Ms. Zebouni was using the shoulder in a reasonably anticipated manner, and the fact that DOTD expected drivers to use the roadway as Ms. Zebouni did.
DOTD contends that the court of appeal erred in finding the culvert presented an unreasonable risk of harm or played a significant role in causing this accident. DOTD argues that testimony at trial proved that nothing on the roadway, the shoulder, or the area adjacent to the shoulder in any way caused Ms. Zebouni to lose control of her vehicle. In support of this argument, DOTD points out that Ms. Zebouni's testimony was that she had a vague recollection of an "embankment" parallel to her windshield that she steered to avoid, but she could not identify the embankment" from photographs or when she visited the accident site. DOTD further argues that the court of appeal erred by concluding that its duty encompassed the risk that Ms. Zebouni would intentionally drive her vehicle out of her travel lane, over the paved shoulder and partially onto the adjacent grassy area without using her brakes while trying to avoid hitting a cat, and then oversteer to the left causing her vehicle to yaw in an effort to avoid what she perceived as an "embankment" parallel to her windshield, cross the centerline of traffic, and collide with Ms. Netecke.

LAW AND ANALYSIS
A plaintiff may proceed against the State through DOTD under either a theory of negligence, based on LA.CIV.CODE art. 2315, or a theory of strict liability, based on LA.CIV.CODE art. 2317 and LA.R.S. 9:2800. In order for DOTD to be held liable, the burden of proof is the same under either theory. That is, the plaintiff bears the burden of showing that:
(1) DOTD had custody of the thing that caused the plaintiff's injuries or damages;
(2) the thing was defective because it had a condition that created an unreasonable risk of harm;
(3) DOTD had actual or constructive knowledge of the defect and failed to take corrective measures within a reasonable time; and
(4) the defect in the thing was a causein-fact of the plaintiff's injuries.
Brown v. Louisiana Indem. Co., 97-1344 (La.3/4/98), 707 So.2d 1240, 1242; Lee v. State, Through Dep't of Transp. & Dev., 97-0350 (La.10/21/97), 701 So.2d 676, 677-78. To recover, plaintiff bears the burden of proving all these inquiries in the affirmative and failure on any one is fatal to the case.
DOTD's duty is to maintain the public roadways in a condition that is reasonably safe and does not present an *495 unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La. R.S. 48:21(A); Campbell v. Department of Transp. & Dev., 94-1052 (La.1/17/95), 648 So.2d 898, 901-02; Oster v. Department of Transp. & Dev., 582 So.2d 1285, 1288 (La.1991). DOTD must maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Brown, 707 So.2d at 1242; Oster, 582 So.2d at 1289-91. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. Graves v. Page, 96-2201 (La.11/7/97), 703 So.2d 566, 572; Rue v. State, Dep't of Highways, 372 So.2d 1197, 1199 (La.1979). This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Ledbetter v. State, Through La. Dep't of Transp. & Dev., 502 So.2d 1383, 1387 (La.1987).
This duty, however, does not render DOTD the guarantor for the safety of all the motoring public. Graves, 703 So.2d at 572; Briggs v. Hartford Ins. Co., 532 So.2d 1154, 1156 (La.1988). Further, DOTD is not the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Id. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. See, e.g., Simeon v. John Doe, d/b/a The Sweet Pepper Grill, 618 So.2d 848 (La.1993). Whether DOTD breached its duty to the public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances determined on a case by case basis. Campbell, 648 So.2d at 901-02.
In the case sub judice, the jury only answered a single interrogatory affirmatively, holding DOTD negligent and/or strictly liable in causing plaintiff's damages. As such, we must presume that the jury concluded that the plaintiff carried her four-pronged burden of proof. It is undisputed that DOTD had custody of La. Hwy. 182 and the culvert in question. However, DOTD vigorously disputes whether the culvert was defective and whether the culvert was a cause-in-fact of the plaintiff's injuries. Accordingly, we will review the record regarding the culvert to determine if the jury's implicit finding of the culvert unreasonably dangerous was manifestly erroneous or clearly wrong. See Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
The trial court accepted Mr. James Lock, a political scientist, as plaintiff's accident reconstruction expert. Mr. Lock testified that less than one second passed from the moment Ms. Zebouni's right tires left the paved shoulder until they reentered past the culvert. He stated that Ms. Zebouni traveled about sixty-five feet before driving over the headwall and then traveled an additional fifteen feet before reentering the shoulder. He concluded that what Ms. Zebouni perceived as the "embankment" was actually the brown grassy area around the culvert that DOTD had sprayed with herbicide. He stated the loss of control of her vehicle was caused by her perception of this "embankment" as a dangerous obstacle in her immediate path and her left steering input reaction to avoid this danger, which caused her car to yaw and reenter the highway at a sharp angle. He also expressed his belief that Ms. Zebouni felt no distinction in road conditions when she steered her vehicle off the paved shoulder and onto the grassy *496 area. He further stated that from the culvert to the point where Ms. Zebouni first perceived to input the left steering was less than a second and between twenty-five feet and forty feet after entering the grassy area. While Mr. Lock admitted typical perception/response times for drivers ranged from three quarters of a second to one and a half seconds, he concluded that Ms. Zebouni reacted so quickly because she was at a heightened state of awareness, i.e., she was a "cued" driver.
On cross-examination, Mr. Lock admitted that Ms. Zebouni's right tires rolled directly over the headwall and that the culvert played no physical role in causing the accident. He further admitted that Ms. Zebouni's car veered left because she steered it left and that an oversteer maneuver is a driver's mistake. He testified that had Ms. Zebouni not steered to the left her car would have safely passed the culvert and would not have impacted any "embankment." Finally, he estimated that given a speed of fifty miles per hour and a reaction time of three-quarters of a second, Ms. Zebouni would have perceived her left maneuver fifty-five feet from the culvert.
Plaintiff also presented the testimony of Maurice Bronstad, accepted by the trial court as an expert in highway and roadside safety. Mr. Bronstad testified that the grassy area adjacent to the paved shoulder on which Ms. Zebouni's right tires traversed was the "useable shoulder" as it fell within the crown of the highway and could be used for emergencies. He opined that the open culvert constituted a roadside hazard since it fell within the crown and the "useable shoulder," and therefore created an unreasonable risk of harm. He deduced that it was Ms. Zebouni's perception of the brown grassy area around the culvert that caused her to oversteer to the left. Accordingly, he reasoned that when this particular portion of La. Hwy. 182 was overlaid and the shoulders were paved pursuant to Project 4-03-08 in 1987, DOTD should have moved the drainage structure outside the useable shoulder as it had done with drainage structures in Project 4-04-20 in Iberia Parish. On cross-examination, Mr. Bronstad stated that the American Association of State Highway Traffic Officials ("AASHTO") and Federal Highway Administration literature he relied upon constitute recommendations, not requirements, in the context of rural state highway "3R" (resurfacing, restoration, and rehabilitation) projects. He conceded that the culvert itself did not physically cause the accident.
DOTD presented the testimony of Teddy Babin, the project and design engineer on Projects 4-03-08 and 4-04-20. The trial court accepted Mr. Babin as an expert in highway design, limited to DOTD standards. Mr. Babin stated in overlaying the highway and paving the shoulders, he followed DOTD rules to limit the work to maintain the existing crown, i.e., the relatively flat surface area before the ditch foreslope. He said that, although the edge of the crown is not necessarily the same point as the edge of the paved surface, with Project 4-03-08, the two points coincided. He explained that DOTD's design criteria for 3R projects required him to disregard any roadside safety issues beyond the highway crown, within reason. Mr. Babin said he extended six culverts four to five feet in Project 4-04-20 because they fell within the crown of the highway. However, the culvert in the case sub judice was located outside the highway's crown and within the ditch's foreslope and therefore was not moved. On cross-examination, Mr. Babin conceded that on 3R projects DOTD does do work outside the crown and that if bridge end rails, mailboxes, and non-breakaway signs were located outside the crown, in the same position as the culvert, then DOTD would move these obstacles.
Richard Savoie testified for DOTD as an expert in highway design. He noted that the purpose of the highway crown is to facilitate water runoff. He testified that the crown of the roadway at the culvert's *497 location extended out to the edges of the paved shoulder and then began the foreslope of the ditch. He estimated that the cost of constructing six and a half foot culvert extensions on both sides of the roadway would be about $2,789. However, he explained that it could not be moved back from its current location because DOTD's right-of-way directly adjoined the railroad's right-of-way. Thus, if it was moved, the culvert would encroach onto the railroad's right-of-way. Mr. Savoie also pointed out that the railroad does not sell its right-of-ways to DOTD. As such, for DOTD to achieve the result desired under plaintiff's theory, it would have had to move the entire highway left, which would entail surveying the area, designing the plans, and redesigning and rebuilding the highway. He estimated the cost, conservatively, at about $750,000 per mile just for construction. Adding in the acquisition of right-of-ways and relocation of utilities, the cost would approach $1,000,000 per mile. He also explained the culverts in Project 4-04-20 were moved because they were in the shoulder of the road and needed to be extended so to provide the motoring public an eight foot paved shoulder.
Mr. Jeff Milburn, a civil engineer accepted by the trial court as an expert in accident reconstruction, highway design, and traffic engineering, testified on behalf of DOTD. Mr. Milburn opined that the culvert was not a dangerous condition and did not cause the accident as it was located nine feet and five inches from the travel lane, its headwall was flush with the paved shoulder, and it was perpendicular to the roadway and virtually invisible. He also explained that the paved shoulder is intended for emergency use and not intended to be driven upon. He further stated that the roadway is not intended for motorists to travel beyond the paved shoulder and drive onto the grassy area. Mr. Milburn testified that Ms. Zebouni input the left oversteer at the culvert and perceived it somewhere between fifty and seventy feet before the culvert. He explained that normal human perception/reaction decisions took at least three-quarters of a second to one and a half seconds. He further testified that looking toward the culvert at about sixty-five feet one could not see the ditch or an "embankment" or anything else that would cause a driver to steer hard to the left. He further stated that Mr. Lock's opinion that one would not feel any sensation when driving off the paved shoulder and onto the grassy area was wrong based on personally performing the maneuver. Finally, Mr. Milburn stated that, given Ms. Zebouni was traveling at about fifty miles per hour, that her car started to move left at about the culvert, that the distance from where she exited the shoulder to the headwall was sixty-five feet, that a normal reaction time at best was three-quarters of a second, and that one would then have to had perceived something at about sixty or seventy feet before the culvert. He concluded that Ms. Zebouni actually perceived leaving the roadway onto the grassy area and reacted to her own error.
As stated above, plaintiff bears the burden of proving all four prongs of her case in order to recover. While neither party contests that DOTD had custody of the culvert, custody alone does not give rise to liability under either theory of recovery. In addition, the injured party must establish that the thing contained a defect which created an unreasonable risk of harm and that the defective condition caused the injury. If the culvert did not present an unreasonable risk of harm to Ms. Zebouni, this implies that DOTD did not owe the alleged legal duty and cannot be held liable for the damages plaintiff sustained. Oster, 582 So.2d at 1288.
Generally, the initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact. Cay v. State, Dep't of Transp. & Dev., 93-0887 (La.1/14/94), 631 So.2d 393, 395. The plaintiff must prove that the alleged defect in the thing was a cause-in-fact of the plaintiffs harm. Brown, 707 So.2d at *498 1242; Campbell, 648 So.2d at 902. A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. Graves, 703 So.2d at 570 (citing FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW, § 4-3, at 86-88 (1996)); Edwards v. Horstman, 96-1403 (La.2/25/97), 687 So.2d 1007. For example, the act is a cause-in-fact in bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1310; Dixie Drive It Yourself Sys. v. American Bev. Co., 242 La. 471, 137 So.2d 298, 302 (1962). Whether an action is the cause-in-fact of the harm is essentially a factual determination that is usually left for the factfinder. Theriot, 640 So.2d at 1310. Although causation is generally the initial criterion, we believe a resolution of this case is best determined when considering whether plaintiff carried her burden of proving that this culvert posed an unreasonable risk of harm to Ms. Zebouni.
The unreasonable risk of harm criterion is not a simple rule of law. Rather, it is a criterion established by this Court to facilitate the judicial process required by our Code. Landry v. State, 495 So.2d 1284, 1287 (La.1986). As such, it becomes the decision maker's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990).
In attempting to define the test, we have described the unreasonable risk of harm criterion as serving as a guide utilized by the decision maker in balancing the likelihood and magnitude of harm against the social utility of the thing. We have cautioned, however, that such a balancing test does not lend itself well to neat, mathematical formulations. Oster, 582 So.2d at 1289. In addition, the decision maker must consider a broad range of social and economic factors, including the cost to the defendant of avoiding the harm, as well as the risk and the social utility of the party's conduct at the time of the accident. Id. In reaching an intelligent and responsible determination, the decision maker must carefully consider all the circumstances surrounding the particular accident under review to determine whether DOTD's legal duty encompassed the risk which caused the plaintiffs injuries and damages and was intended to protect this plaintiff from this type of harm arising in this manner. Oster, 582 So.2d at 1289; Landry, 495 So.2d at 1287; Entrevia, 427 So.2d at 1151 (Lemmon, J., concurring). The imperfection or irregularity must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Deville v. State Farm Ins. Co., 617 So.2d 1255, 1257 (La.App. 3 Cir.1993); Bealer v. National Tea Co., 597 So.2d 1242, 1244 (La.App. 3 Cir.1992).
Clearly, the magnitude of the harm suffered by Ms. Netecke was great and tragic. She suffered severe and debilitating injuries causing cognitive deficits and an amputated leg. The likelihood of the harm in the present case, however, was minimal. Where a culvert is open, in full view, flushed with and abutting the paved shoulder, and clearly marked by a warning delimitator, the culvert itself serves as a warning of apparent and obvious risk to the motoring public exercising ordinary care and reasonable prudence. The record reveals that numerous motorists traveled La. Hwy. 182 and numerous brown grassy areas were present in the area adjacent to the paved shoulder, yet this is the only accident in the record in which a motorist perceived an "embankment." Indeed, Ms. Zebouni admitted seeing other areas along the highway that were brown in color. Also, the likelihood that a driver would intentionally steer her vehicle out of a *499 twelve foot wide travel lane, across an eight foot wide paved shoulder, and eight to ten inches onto the brown grassy area without stopping or significantly slowing her vehicle, and then perceive an "embankment" which was not there but fail to see the warning delimitator clearly marking the culvert all in an effort to avoid a cat in the opposite lane of travel is de minimis.
Balanced against this backdrop is the social utility of the culvert and the brown grassy area surrounding it. The purpose of the culvert is clear: it is designed and intended to keep water from draining onto the travel portion of the highway and causing a dangerous situation for motorists. Because the culvert helps make travel along the roads of this state safer by facilitating the drainage of water off the highway, it has great social utility, notwithstanding that it may pose some risk to the motoring public. Culverts are a common feature along the roads and highways. Spraying herbicide around culverts along the roads and highways is a common practice and facilitates their utility by preventing grass, weeds, and overgrowth from hampering their function and ensures that the culverts' warning delimitators and the culverts themselves are clearly visible to the motoring public. In sum, under the circumstances of this case, we find the culvert and the brown grassy area at issue in this case support a social utility that outweighed any perceived risk of harm by Ms. Zebouni.
Next, we must consider all the other social and economic factors pertinent to the case. Initially, we note that Ms. Netecke was lawfully driving on La. Hwy. 182 in a manner consistent with its intended use and purpose. Accordingly, the social utility of her conduct was meaningful. However, Ms. Zebouni's use of the highway at the time of the accident was not. The record indicates that in an attempt to avoid a cat in the opposite lane of travel, Ms. Zebouni executed her avoidance maneuver, traveled outside her travel lane and paved shoulder and onto the grassy area at a high rate of speed and without attempting to stop or significantly slow her vehicle. Further, she perceived an "embankment" that did not exist and failed to see the culvert's warning delimitator, which was clearly visible. We must also consider that a motorist, exercising ordinary case and reasonable prudence, should not attempt to reenter the highway at an excessively high rate of speed. Had Ms. Zebouni remained in her travel lane or the paved shoulder or even continued on her path in the grassy area, she would have traveled past the culvert without incident and would not have lost control of her vehicle. Under the circumstances of this case, we find no social utility in the reckless manner Ms. Zebouni negotiated her vehicle coupled with her perception of an "embankment."
Finally, the physical and financial inability of DOTD to maintain the State's roadways, shoulders, and right-of-ways in anything more than a reasonably safe condition has been considered by this Court in the past as a factor in determining whether a particular condition complained of presents an unreasonable risk of harm to the plaintiff. See, e.g., Hunter v. Dep't of Transp. & Dev., 620 So.2d 1149, 1153 (La.1993); Oster, 582 So.2d at 1291; Manasco v. Poplus, 530 So.2d 548, 550 (La. 1988); Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1173 (La.1986). Plaintiff argues that there were a number of economically feasible options available to DOTD regarding the culvert. Primarily, plaintiff contends that the accident could have been prevented if the culvert had been moved farther away from the paved shoulder at the cost of $2,789.[7] However, this figure takes into account only the construction cost of the culvert. *500 The true cost to the State to accomplish plaintiff's desired result would amount to a figure between $750,000 and $1,000,000 per mile. While the avoidance of all accidents on our State's highways is highly desirable, the question is whether it is reasonable to impose a rule of law which would require DOTD to reconstruct every highway within its control to provide such or face the prospect of tort liability. DOTD's jurisdiction extends over thousands of miles of roads in this State. Considering this, reconstructing all of the highways in this State would be fiscally impossible. Furthermore, the law does not require such an effort. DOTD clearly marked the culvert with a warning delimitator. DOTD also sprayed a herbicide around it to prevent its function from being diminished or from overgrowth preventing it from it being visible to the motoring public exercising ordinary care and reasonable prudence. The cost to DOTD to make its highways, shoulders, and adjacent areas safe from all misperceptions of the motoring public would be overwhelming and impossible. Furthermore, placing the burden on DOTD to reconstruct our State's highways and roadways to prevent such misperceptions and foresee such circumstances would create such an onerous burden that DOTD would essentially be rendered the guarantor for the safety of all the motoring public and the insurer of all risks. We decline to place such a burden.
DOTD cannot be held responsible for all injuries on the state's highways that result from careless driving. Based on the above analysis and having reviewed and considered the record, the testimony, and the evidence in its entirety, we conclude that the lower courts were clearly wrong in finding that DOTD's failure to move the culvert or its conditions rendered it defective and created an unreasonable risk of harm to Ms. Zebouni causing her to overcorrect her avoidance maneuver resulting in this tragic accident. To hold otherwise would place an unreasonable burden on the State and DOTD to foresee and prevent all misperceptions of the motoring public. DOTD's legal duty did not encompass the risk that a driver, in an effort to avoid a cat in the opposite lane of travel, will intentionally drive her vehicle out of her travel lane and paved shoulder and onto the adjacent grassy area without stopping or significantly slowing her vehicle, and then overcorrect her mistake when she perceives something that was not there.
It is obvious that it was Ms. Zebouni's own misjudgment and not any defective condition created by DOTD that caused Ms. Zebouni to negotiate her vehicle in such a negligent and dangerous manner. The record evidence clearly establishes that the accident was caused solely by driver error. We find that the plaintiff failed to prove any defect in the roadway that created an unreasonable risk of harm to the motoring public which ultimately caused plaintiff's harm under the facts of this case. Having failed in her burden of proof, plaintiff is not entitled to recover against DOTD under either theory of fault she advanced. The court of appeal erred in affirming the judgment against DOTD. We must reverse.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and judgment is hereby rendered in favor of the State of Louisiana, through the Department of Transportation and Development, and against Traci Allen Netecke. The lower courts' judgment allocating fault is recast finding Ms. Zebouni one-hundred percent at fault. All cost of these proceedings are cast to Traci Allen Netecke.
REVERSED AND RENDERED.
JOHNSON, J., dissents and assigns reasons.
*501 
JOHNSON, Justice, dissenting
By finding that the negligent driver is 100% at fault, the majority has exempted the State from liability for failing to maintain its roads in a reasonably safe condition. The record is replete with evidence that supports the jury's conclusion that the roadway was defective and created an unreasonable risk of harm.
This case closely resembles Campbell v. La. Dep't of Transp. & Dev., 94-1052 (La.1/17/95), 648 So.2d 898. In Campbell, *502 a driver of a vehicle fell asleep at the wheel and struck a bridge abutment that lacked a guardrail. This court held that the driver's failure to maintain control of his vehicle did not relieve DOTD of its duty to maintain the highway in a safe condition. This court further held that, in apportioning fault, courts should look not only at where fault lies for the accident, but also where fault lies for the harm. DOTD was found to be seventy-five percent (75%) at fault in causing the plaintiffs injuries.
In addition to the duty to keep state highways in a reasonably safe condition, DOTD has a duty to keep the shoulders of its highways in a reasonably safe condition. LeBlanc v. State, 419 So.2d 853, 856 (La. 1982) (emphasis added). The DOTD also has a duty to keep the area off the highway shoulder in such a condition that it does not pose an unreasonable risk of harm to motorists using the travel lanes or shoulder. Oster v. Dep't of Transp. and Dev., 582 So.2d 1285, 1286 (La. 1991)(emphasis added). These duties encompass the foreseeable risk that, for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. Begnaud v. Dep't of Transp. and Dev., 93-639 (La.App. 5 Cir. 1/12/94), 631 So.2d 467, 470. A motorist has the right to assume that a highway shoulder is maintained in a reasonably safe condition. Rue v. Dep't of Highways, 372 So.2d 1197, 1199 (La.1979).
The Federal Highway Administration cited drainage culverts as among the top five causes of fatalities on the nation's highways in 1980. Additionally, American Association of State Highway Transportation Officials (hereinafter "AASHTO") standards require the removal of actual or potential hazards from the area adjacent to the highway shoulder. Clearly the presence of a three feet by six foot drain, located directly adjacent to the shoulder of a highway, is a potential hazard. Additionally, the AASHTO Traffic Safety Committee stated that a clear recovery area, free of obstructions, should be provided along the roadway thirty (30) feet or more from the highway. The Committee's summary of conclusions and recommendations about highway safety stated:
To increase safety when vehicles leave the pavement, a clear recovery area, free of physical obstruction, should be provided along the roadway thirty (30) feet or more from the edge of the traveled way in rural areas. Corrective programs should be undertaken at once to eliminate from the roadside or to relocate to protected positions, such hazardous fixed objects as trees, drainage structures, massive sign supports, utility poles, and other ground-mounted obstructions that are now exposed to traffic. (emphasis added)
Traffic Safety Committee, AASHTO, Highway Design and Operational Practices Related to Highway Safety 1-2 (1967). Failure to adhere to AASHTO standards may not by itself provide the basis for liability. Dill v. Dep't of Transp. and Dev., 545 So.2d 994, 996 (La.1989). However, whether or not the DOTD has conformed to those standards is a relevant factor in determining whether or not a roadway is unreasonably dangerous. Id.
In the instant case, the majority mistakenly relies on the fact that Ms. Zebouni swerved to avoid hitting a cat in the road and erred in holding that DOTD did not breach its duty to plaintiff. The court should have allocated fault to both DOTD and Ms. Zebouni. The record clearly supports the conclusion that the location of the drainage culvert in relation to the highway shoulder presented an unreasonable risk of harm. The drainage culvert was located directly adjacent to the paved shoulder. Any vehicle traveling along the shoulder could possibly encounter this drain. The only thing that kept Ms. Zebouni's right tires from falling into this hole was an eight inch wide concrete headwallthe same headwall that Ms. Zebouni's right tires crossed over before *503 she lost control of her car. The record establishes that Ms. Zebouni lost control of her car when she tried to steer clear of this six foot culvert.
I disagree with the majority's conclusion that the drainage culvert played no active role in the accident, since the location of the drainage culvert was obviously a substantial factor in causing Ms. Netecke's injuries. The accident occurred when Ms. Zebouni attempted to avoid hitting the drainage culvert by steering away from it. Had the drainage culvert not been located adjacent to the highway, Ms. Zebouni would not have encountered it when she was driving along the shoulder.
In support of its conclusion that the drainage culvert did not present an unreasonable risk of harm, the majority reasoned that the cost to relocate the drainage culvert at issue would place an unreasonable burden the State. However, the record shows that cost of moving the culvert further from the road was $2,789.00. In fact, in Iberia Parish, the parish directly adjacent to St. Martin Parish where the accident occurred, the drainage culverts located along Highway 182 were extended four to five feet away from the paved shoulder to enhance safety.
In this case, the accident occurred when Ms. Zebouni attempted to avoid hitting the drainage culvert by steering away from it. It is not unreasonable for the jury to have concluded that, had the culverts in St. Martin Parish been extended away from the shoulder as well, Ms. Zebouni would not have encountered the culvert, perceived it to be a hazard, and lost control of her car.
Despite our system of comparative fault which allows the courts to apportion fault among several negligent parties, in recent cases this court has indicated a reluctance to award any damages to negligent drivers. Philosophically, we may be returning to a time when a driver who is only 1% at fault will be denied recovery. In this case, we have an innocent victim. The driver's negligence should not defeat her recovery.
For the foregoing reasons, I respectfully dissent.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part 2, § 3.
[1] Although DOTD and Ms. Netecke set forth several assignments of error regarding liability, quantum, and allocation of fault, because we conclude that the culvert was not defective because it did not have a condition creating an unreasonable risk of harm to Ms. Zebouni, these additional assignments are rendered moot.
[2] The headwall is part of a drainage culvert that runs under the highway and facilitates drainage.
[3] Attached to this opinion is a copy of defendant's exhibit # 11, which is a picture of the area at the culvert in question taken at the scene of the accident.
[4] For a complete description of Ms. Netecke's injuries, see Netecke v. State, Through the Dep't of Transp. & Dev., 97-974 (La.App. 3 Cir. 4/1/98), 715 So.2d 439, 442.
[5] Ms. Netecke's alleged common-law husband, Michael Netecke, filed suit against the defendants alleging loss of consortium. Before trial, the court granted an exception of no cause of action filed by Ms. Zebouni concluding that he had failed to prove that he and Ms. Netecke had contracted a valid common-law marriage under Texas state law. His appeal is not part of this record.
[6] Ms. Zebouni did not seek writs from the court of appeal's judgment and filed a brief only after we granted DOTD and Ms. Netecke's writs. She argues that the appellate court's reallocation of fault was wrong because the culvert's hazardous condition played a great role in causing this accident and therefore a corresponding percentage of fault must be allocated to DOTD.
[7] Plaintiff also argued that a guardrail or culvert cover would have prevented this accident. While the cost of these would not have been as great, we do not believe they are pertinent to the case as these would not have prevented Ms. Zebouni from perceiving a brown "embankment."