562 So.2d 1093 (1990)
Lee O. PULLEN
v.
Frank ZIEGLER, Jr., et al.
No. 89-CA-2073.
Court of Appeal of Louisiana, Fourth Circuit.
May 31, 1990.
*1094 John T. Culotta, Richard T. Simmons, Jr., Hailey, McNamara, Hall, Larmann & Papale, Metairie, for defendants-appellees.
Terry B. Loup, Glenn Lieberman, Morris Bart Associates, New Orleans, for appellant.
Before BYRNES, CIACCIO and WILLIAMS, JJ.
BYRNES, Judge.
Plaintiff Lee Pullen appeals from a judgment of the district court which awarded him damages of $47,500 for injuries sustained in a rear end collision. Finding the plaintiff's three assignments of error to be without merit, we affirm the judgment of the trial court.
On appeal plaintiff makes the following assignments of error: (1) the jury award was inadequate; (2) the trial court erred in admitting certain physical evidence and (3) the trial court erred in failing to give plaintiff's requested jury charge.
On June 25, 1986 Lee Pullen was riding in a pickup truck which was driven by his wife. At the intersection of South Villere *1095 and Cleveland Place in New Orleans, the plaintiff's vehicle was moving slowly towards a stop sign when it was struck from behind by a Leidenheimer Baking Company delivery truck, being driven by Frank Ziegler, and which was being driven in the same direction as the plaintiff's vehicle.
As a result of the accident the plaintiff struck his head on the truck's post and fell to the floor of the vehicle striking his knee. He was treated for neck and low back pain by Dr. Charles Anastasio, an orthopedist, from the date of the accident until August, 1986. Thereafter the plaintiff was treated by Dr. Charles Billings, an orthopedic surgeon until April, 1989. During this time Dr. Billings performed a spinal discectomy of the L4-5 region and a foraminotomy.
In his first assignment of error the plaintiff contends that the jury's damage award was inadequate. He reasons that the award of $47,500 (which plaintiff alleges consists of $19,476.50 medical expenses, $18,023.00 loss income and $10,000 general damages) constitutes an abuse of discretion.
Much discretion is left to the trier of fact in the assessment of damages. Perniciaro v. Brinch, 384 So.2d 392 (La. 1980). Before the appellate court will disturb a damage award the record must clearly reveal that the trier of fact abused his discretion in making the award based upon the particular injuries and their effect upon the particular individual who sustained the injuries. Perniciaro v. Brinch, supra; Reck v. Stevens, 373 So.2d 498 (La. 1979). Once a determination is made that an abuse of discretion exists, the appellate court may look to other cases wherein similar injuries were sustained in order to assess damages. See: Reck v. Stevens, supra. Provided the abuse of discretion did not result from a factual or legal error, the appellate court may only raise the award to the lowest point which is reasonable within the discretion afforded the court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). If, however, the abuse of discretion results from a factual or legal error the appellate court will make an independent evaluation of the record and exercise its own discretion in fixing a de novo quantum award. Suhor v. Gusse, 388 So.2d 755 (La.1980).
In this case the record reveals the following evidence regarding the damages sustained by the plaintiff:
Mr. Lee Pullen was a 54 year old male with a third grade education. He had earned a living for thirty years as a long haul truck driver.
Prior to this accident, the plaintiff has a twenty year history of low back problems including three separate injuries to his lower back. In mid-1966, Mr. Pullen injured his back while loading sacks of animal feed. In April, 1967 he was lifting boxes and reinjured his back. Thereafter, due to numbness in his left leg he fell from a chair. In 1979, the plaintiff sustained injuries in a truck accident which necessitated his hospitalization and diagnostic-testing which included a myelogram. During the period of 1979 through 1980 he was treated on eight occasions by Dr. Anastasio for back pain. During the last visit of that period a neurological evaluation was suggested as the plaintiff manifested symptoms which could have suggested a herniated disc.
Dr. Anastasio reportedly also had treated the plaintiff in 1979 and 1980. According to Dr. Anastasio, on March 27, 1979 the plaintiff visited him as a result of an auto accident in which he experienced a hematoma of the left thigh. At the time, plaintiff reportedly had a history of back problems dating to 1969. The plaintiff was treated in July 1979 by Dr. Anastasio and at the time he complained of low back pain.
In August 1979 the plaintiff had back problems of an undetermined origin and plaintiff was advised these problems would flare up at any time. Since plaintiff had back problems in the past, it was probable he would experience them again. On December 11, 1979, the plaintiff had back and left thigh pain. According to Dr. Anastasio, the pain in the thigh was sciata and it could have resulted from a degenerative disc disease.
*1096 On January 1, 1980 the plaintiff had low back pain for which Dr. Anastasio prescribed cortisone, muscle relaxers and valium.
The plaintiff saw Dr. Anastasio on May 23, 1980 with complaints of pain in the left buttock and posterior thigh.
Minimal symptoms appeared on August 1, 1980 and the plaintiff was released by Dr. Anastasio to return to work. On December 19, 1980, plaintiff again complained of low back pain especially on the left side. At the time, cortisone was administered and a corset prescribed. According to Dr. Anastasio the plaintiff did not then have a herniated disc. The plaintiff was not seen from December 19, 1980 until June 25, 1986.
Following the instant accident, the plaintiff again visited Dr. Charles Anastasio for treatment.
On the date of the accident the plaintiff complained of neck and low back pain which radiated into the right groin. An examination revealed no nerve abnormality and normal reflexes, however pain was present upon palpatation. Dr. Anastasio prescribed a neck brace, corset and out-patient physical therapy for the plaintiff. He also referred the plaintiff to Dr. Overby in order to rule out an inguinal hernia.
The plaintiff was next seen by Dr. Anastasio on July 1, 1986 and he evidenced improvement resulting from the physical therapy. There was an increased range of neck and back motion. Continued physical therapy was recommended. An examination of the plaintiff on July 22, 1986 revealed stiffness in the neck and back with occasional pain in the left posterior thigh coming from the back. There was tenderness in the neck and back. There were no positive objective findings on this date. Physical therapy was to continue and a cortisone injection was administered for pain in the left low back. On August 5, 1986, the plaintiff was experiencing the first recorded neck pain; restricted motion, and occasional headaches. His low back pain was decreased and he was told to continue physical therapy. He was scheduled for an appointment on August 19, 1986 but did not appear for his appointment. Dr. Anastasio found the plaintiff to be suffering from symptomatic cervical and lumbar disc disease which was brought on by the auto accident of June 24, 1986.
Dr. Anastasio reviewed the plaintiff's x-rays and found that in 1968 they revealed minimal marginal spurring which would suggest degenerative disc disease.[1] The degenerative disc disease can cause sciata and can cause the disc to herniate because of normal wear and tear or trauma. The x-rays of 1979 and 1986 showed spurring and minimal arthritis in the facet joints.
According to this physician, the examination of 1979 and the x-rays showed a pre-existing degenerative disc located at L4-5. At that time plaintiff was found to be suffering from symptomatic lumbar and cervical disc disease and he had had a long standing history of back problems. The problems were from an undetermined cause and could flare up at any time.
Beginning on July 29, 1986 the plaintiff was first seen by Dr. Charles Billings, an orthopedic surgeon. He relayed to Dr. Billings that he had been in the present accident and that he had been seen by Dr. Anastasio. At the time of this first examination the plaintiff complained of low back and neck pain. He experienced pain radiating into the left leg and pain sometimes in the right shoulder. An examination of the plaintiff revealed a flattening of the lumbar lordosis with restrictions of the lumbar spine secondary to pain. The straight leg raises at 70 degrees produced low back pain. An x-ray revealed spur formation and a narrowing of the disc space with some collapse in the disc region. Dr. Billings diagnosed the plaintiff as having an accelerated whiplash injury to the neck and a post traumatic exacerbation of the degenerative lumbar disc and joint disease. He prescribed anti-inflamatants and physical therapy. He advised the plaintiff not to engage in heavy lifting, repetitive bending *1097 or stooping and no prolonged sitting or standing.
The plaintiff was seen regularly from August 1986 through October 1987 and his neck pain improved but the back pain persisted despite restricted activity and conservative treatment. He underwent a series of tests, including a CAT scan, x-ray and MRI. The CAT scan revealed, among other things, a disc herniation of the L4-5. Since non-operative care did not improve the plaintiff's condition surgery was suggested.
On October 19, 1986 the plaintiff was admitted to Touro Infirmary and on October 22, 1986 a spinal discectomy of the L4-5 region and foraminotomy was performed. The nine day post operative period spent in the hospital was non-eventful. The plaintiff was told to severely restrict his activities, to wear a corset, walk, stay off his feet for 2-3 hours in the afternoon and get 8-10 hours of bed rest per night. Regular office visits occurred up to and including April 5, 1989. The symptoms were under control but there was intermittent low back pain and mild low back pain with straight leg raises. Dr. Billings found the plaintiff to be suffering from spinal wear and tear due to degenerative changes in the low back with a herniated disc at the L4-5. There were hypertrophic spurs at L4-5 and L1-2 which took in excess of two months to form. According to Dr. Billings the plaintiff's disc herniation was due, at least in part, to the accident of June 25, 1986, as the patient's condition was successfully controlled until then. If however he knew of previous accidents by the plaintiff this would change his opinion regarding causation. He was of the opinion that the spine was impaired before the accident. The degenerative changes could result from age or trauma.
The plaintiff's physical impairment was placed at 15-20% to the low back or 10-15% to the whole body. His symptoms were controlled and conservative treatment with certain activity restrictions were recommended. The plaintiff was told not to engage in heavy lifting, prolonged sitting or standing, no repetitive bending or stooping. It was Dr. Billing's opinion the plaintiff could not return to long haul trucking as the prolonged sitting and vehicle vibrations would cause symptoms.
The plaintiff testified that his physical activities were impaired as a result of the accident. He could not lift objects in excess of twenty pounds. He stated that he was thus unable to lift the bags of horse feed nor could he lift his grandchildren. He could not bend over and hence was prevented from putting on his shoes and socks.
However a video tape of the plaintiff showed him engaged in various athletic activities such as climbing in and out of a tractor rig, carrying a filled sack over his shoulder, pumping gas and grooming a horse.
Dr. Cornelius Gorman is a specialist engaged in general rehabilitative services. He evaluated the plaintiff on February 23, 1988 and based his analysis on information provided by the plaintiff and medical documentation. Dr. Gorman found the plaintiff to be a truck driver with a third grade education. He was a borderline reader and speller. He had a below normal intelligence and dull normal experience. According to Dr. Gorman if one considers the plaintiff's experience and restrictions from a competitive work basis there are no jobs he can perform.
Dr. Gorman admitted that he was lacking certain materials in making his evaluation of the plaintiff. In particular he didn't have the physical therapy notes so as to chart the plaintiff's progress. He also did not have the functional capacities assessment. Additionally, he was not informed that the plaintiff had been a cab driver. According to Dr. Gorman if the plaintiff could sit and stand at will, it would facilitate his employment. Gorman felt he could probably be a cab driver or perform light deliveries.
Dr. Seymour Goodman is a professor of economics at Tulane University. He reviewed the income tax returns of the plaintiff for 1984 through 1987. Based upon a work life expectancy of 6½ years and a life expectancy of 19.7 years the witness concluded *1098 the plaintiff had past lost wages of $46,989.83 and future lost earnings of $113,400.41. The witness used an average interest yield of 6.625% per annum and an inflation rate of 6.04%. The plaintiff's income figures which were utilized were $16,170.12 for 1983; $18,787.13 for 1984; and $26,939.37 for 1985. The witness worked from an assumption that the plaintiff could not work at all and that his injuries were the result of the subject accident.
Kenneth Boudreaux is also an economist employed with Tulane University. Unlike Dr. Goodman who utilized the date of trial as the determination for computing life expectancy, this witness used the date of the accident. Dr. Boudreaux concluded that the plaintiff had a work life expectancy of 8 1/3 years. He utilized the plaintiff's income from 1984 of $8,545; 1985 of $22,520 and six months of 1986 of $1,300 in arriving at his conclusions regarding lost income. Dr. Boudreaux postulated that the plaintiff would have a 5% per year increase in income and an 8¾% discount rate was utilized. He concluded based on this information that the plaintiff would have past loss of income of $30,571.39. He assumed the plaintiff could return to work earning $3.35 per hour and this would give him future loss income of between $17,586 and $19,200. If plaintiff were not able to return to work he would have future loss of earnings of $49,000.
The plaintiff, on appeal, argues that the $47,500 damage award is inadequate. He reasons that $19,476.50 were medical expenses which were not contested and hence he contends this full amount of expenses forms a portion of the jury's award.
The jury's award is reflected in the questions posed to them in the verdict at the time of trial, and are as follows:
* * * * * *
2. What general damages (pain, suffering and disability, past and future) did Lee O. Pullen sustain as a result of the accident? $10,000.00
3. What special damages (medical expenses, past and future, lost income and diminished earning capacity) did Lee O. Pullen sustain as a result of this accident? $37,500.00
Based upon the information in the record we cannot say what portion of the $37,500 award of special damages, constitutes the figure given for medical expenses, for to say otherwise, would be mere speculation.
It is apparent, however from the sum of damages awarded, that in the jury's opinion the full extent of the damages sustained by the plaintiff was not the result of the instant accident. There was adequate evidence to support such a finding. The testimony indicated that the plaintiff had numerous accidents and back injuries prior to this incident. The expert testimony indicated that the herniated disc suffered by the plaintiff may have been caused by factors totally unrelated to this accident. Additionally, the activities of the plaintiff, as recorded on film and by lay witnesses would support a finding that his physical restrictions were far less than he projected at trial.
Considering the conflicting evidence presented regarding the plaintiff's condition after this accident, his prior history of spinal problems and the extent of his restrictions following this accident we cannot say that a jury award of $10,000 general damages and $37,500 special damages is clearly wrong.
In its second assignment of error, and in an apparent attempt to have this Court make a de novo award of quantum, the plaintiff alleges that a legal error exists in that the trial court improperly admitted a bag of animal feed into evidence. Generally, evidence is admissible if it is relevant and a proper foundation for its admissibility has been presented. La.C. Evid. Arts. 401-402, 602, 613. Such evidence will be admitted unless its prejudicial effect outweighs its probative value. La.C. Evid. Arts. 403.
In the instant case the plaintiff, in an attempt to prove that his physical condition as a result of accident severely restricted his physical activities, testified that he had been unable to lift bags of horse feed. This testimony was corroborated by his wife. Christopher Will and Gary Cook, private *1099 investigators, testified that they observed the plaintiff carrying a large brown feed sack which was similar in size to the one at issue.
In admitting the feed sack into evidence the court instructed the jury that the instant sack was like the sack they had observed in the video film of the plaintiff.
Under these conditions we find that the evidence was properly admitted and that it was relevant, probative and the proper foundation was laid for its admission. Additionally, the prejudicial effect, if any, was outweighed by its probative value. This assignment of error lacks merit.
In his final assignment of error the plaintiff contends that the trial court erred when it failed to give the plaintiff's requested jury charge on force of impact. In particular the plaintiff desired the jury to be instructed that where medical testimony establishes that a plaintiff sustained some injuries, the minimal force of the collision causing the injuries is of no material importance.
In making a charge to the jury the trial judge is not required to give the precise instructions submitted by a party but, he has a duty to charge the jury as to the law applicable to the case and also a responsibility to reduce the possibility of confusion. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.1983), writ den. 434 So.2d 1097 (La.1983).
In this case, as in Aymond v. Rose, the requested special jury charge could very possibly have confused the jury into believing that "some substantial award was in order irrespective of the medical evidence produced at the trial." 368 So.2d 1222 at 1224 (La.App. 4th Cir.1979). For this reason we find no error in the trial court's exclusion of this special jury charge.
For the reasons assigned the judgment of the trial court is affirmed at plaintiff's costs.
AFFIRMED.
NOTES
[1] According to Dr. Anastasio the disc begins to wear and they tear down beginning at age 15 and in advance stages there are no "shock absorbers" and little spurs form.