STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-28

MR. & MRS. JONATHAN CHATELAIN, ET AL

VERSUS

RODNEY RABALAIS, ET AL.

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 98-5912-A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

**********

JOHN B. SCOFIELD
JUDGE*

**********

Court composed of Jimmie C. Peters, Michael G. Sullivan, and John B. Scofield,
Judges.

AFFIRMED IN PART, REVERSED IN PART AND RENDERED.

Daniel G. Brenner
P. O. Box 11590
Alexandria, LA 71315-1590
Counsel for Defendant-Appellant
    Rodney Rabalais

Angelo Joseph Piazza, III
P. O. Box 429
Marksville, LA 71351
Counsel for Plaintiffs-Appellees
    Mr. & Mrs. Jonathan Chatelain, Amanda Chatelain, Alesha Chatelain and
    Vincent Chatelain

SCOFIELD, Judge[*].

This is a legal malpractice case filed against Rodney Rabalais, an attorney practicing in Marksville, Louisiana. Plaintiffs had engaged Rabalais to represent them in a tort claim against Patrick Brouillette but before Rabalais filed the lawsuit, the claim against Brouillette had prescribed.

## THE TRIAL COURT PROCEEDINGS

The underlying claim against Brouillette arose from an incident which occurred on July 2, 1997. On that date, in the early morning hours, Jonathan and Lauren Chatelain and their three children, Alesha, Amanda and Vincent, were awakened by the sound of a gun or guns being fired directly into their house. Brouillette, who had wrecked his automobile in the vicinity of the Chatelain home near Marksville, Louisiana, approached the Chatelain home, presumably for the purpose of commandeering a Chatelain vehicle. As he approached, he began shooting at the house.[1] Upon hearing the gunfire, Lauren and the children retreated to the back of the house. Jonathan armed himself and began returning Brouillette's fire. In the exchange of gunfire, Brouillette was hit, wounded and immobilized, bringing to an end the shooting incident.

Brouillette was arrested, tried and sentenced to jail for the crimes he had committed upon the Chatelains and their property. The Chatelains engaged Rabalais to pursue their civil remedies against Brouillette. Rabalais failed to file a lawsuit on or before July 2, 1998, resulting in the case against Brouillette prescribing.

---

[*] John B. Scofield, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

[1] At the trial Brouillette, testified that because of his consumption of drugs and alcohol that night, he had no recollection of what had transpired.

Jonathan then engaged the Chatelain's current attorney to pursue a malpractice claim against Rabalais. On November 24, 1998, a civil action was filed against Rabalais on behalf of Mr. and Mrs. Chatelain and their three children. Later, Lauren Alesha and Vincent, were allowed to withdraw from the lawsuit. On October 7, 1999, Lauren, Alesha and Vincent petitioned the court to re-enter the lawsuit, but eventually, the renewed claims of Lauren and Alesha were dismissed on the basis of prescription. Vincent was allowed to rejoin the lawsuit. Accordingly, when this matter went to trial, the Plaintiffs were Jonathan, Amanda and Vincent.

At the trial, Rabalais did not dispute his allowing the Chatelains' claim against Brouillette to prescribe. The damages claimed by the Plaintiffs fall into two major categories: First, they claim those damages that they would have recovered had they gone to trial against Brouillette; and second, they independently claim damages against Rabalais for the emotional injuries they allegedly sustained as a result of his actions and inactions.

The verdict form submitted to the jury consisted of eleven interrogatories. The jury returned a verdict, finding that as a result of the actions of Brouillette, Jonathan sustained general damages of $45,000.00 and special damages of $5,000.00, and that Amanda and Vincent each sustained general damages of $20,000.00 and special damages of $5,000.00.

The jury also found that Rabalais had deviated below the standard of the care required of an attorney, the jury awarding each Plaintiff the identical amount that had been awarded due to the actions of Brouillette. This resulted in a total judgment of $100,000.00 being awarded to Jonathan and $50,000.00 awarded each to Amanda and Vincent.

2

Rabalais moved the court for a judgment notwithstanding the verdict or, alternatively, for a new trial. Both motions were denied. Rabalais suspensively appealed the Judgment of the trial court and Plaintiffs answered the appeal seeking an increase in the damages awarded them.

## ISSUES ON APPEAL

Given that Rabalais is not contesting liability, the only issues on appeal are the various elements of damages awarded to the Plaintiffs.

## THE DAMAGE ISSUES IN GENERAL

The law provides that "To prove a claim for legal malpractice a plaintiff must prove: (1) there was an attorney-client relationship; (2) the attorney was negligent and (3) that negligence caused plaintiff some loss." *Beis v. Bowers*, 94-0178 (La.App. 4 Cir. 01/19/95), 649 So. 2d 1094, *writ denied*, 95-429 (La. 3/30/95), 651 So.2d 847, *citing Scott v. Thomas,* 543 So. 2d 494 (La.App. 4 Cir. 1989) and *Evans v. Detweiler,* 466 So. 2d 800 (La.App. 4 Cir. 1985). See also William E. Crawford, 12 Louisiana Civil Law Treatise--Workers' Compensation § 15.23 (2000). Additionally, because legal malpractice is a tort, damages for mental anguish may be awarded in a legal malpractice action. *Vallier v. Louisiana Health Systems, Inc.*, 98-834 (La.App. 3 Cir. 12/9/98), 722 So.2d 418, *writ denied*, 738 So.2d 587 (La. 2/26/99); *Henderson v. Domingue*, 626 So.2d 555 (La.App. 3 Cir. 1993), *writ denied*, 630 So.2d 1/28/94).

One measure of the damages can be the amount the Plaintiffs would have received had the underlying case gone to trial and judgment. In addition, the law also recognizes that the Plaintiffs can also receive an award for the damage arising out of the actions or inaction of their attorney. *Beis*, 649 So. 2d 1094*; Henderson*, 626 So.2d 555.

In this case, Plaintiffs have claimed general and special damages resulting from the injuries they sustained because of the actions of Brouillette. They have also claimed general and special damages based solely on the action and inactions of Rabalais. Hereinafter, we will refer to these two categories of damages as Brouillette damages and Rabalais damages.

BROUILLETTE DAMAGES:

After first determining that all of the Plaintiffs suffered damages as a result of the actions of Brouillette on July 2, 1997, the jury then responded to interrogatories 6, 7 and 8 and set forth in dollars the amount to be awarded to each Plaintiff for the general and special damages caused by Brouillette.[2]

Brouillette General Damages:

Rabalais' primary focus on appeal is that the trial court failed to include on the verdict form Rabalais' requested interrogatories which would have more expressly addressed Brouillette's ability to pay.[3] The main thrust of Rabalais' argument is that

---

[2] The completed interrogatories 6, 7 and 8 on the verdict form read as follows:

6) In terms of dollars, how much in total damages, if any, did Jonathan Chatelain suffer or sustain, as a result of the actions of Herbert Patrick Brouillette?

   a) General Damages   $ 45,000.00
   b) Special Damages   $ 5,000.00

7) In terms of dollars, how much in total damages, if any, did Amanda Chatelain suffer or sustain, as a result of the actions of Herbert Patrick Brouillette?

   a) General Damages   $ 20,000.00
   b) Special Damages   $ 5,000.00

8) In terms of dollars, how much in total damages, if any, did Vincent Chatelain suffer or sustain, as a result of the actions of Herbert Patrick Brouillette?

   a) General Damages   $ 20,000.00
   b) Special Damages   $ 5,000.00

[3] Rabalais submitted to the court the following requested interrogatories on the issue of Brouillette's ability to pay:

9. Do nine or more of you agree that Herbert Patrick Brouillette could have actually paid the total judgment in number 6, 7 and 8, above?

4

Brouillette's impecuniosity is such that had the underlying lawsuit gone to judgment, Brouillette would have been able to pay very little, if anything, in satisfying such a judgment. Rabalais, further argues that requiring the Defendant to pay the full face value of any such judgment – which according to Rabalais, Brouillette could never pay – would result in Plaintiffs receiving a windfall for the damages attributable to the actions of Brouillette. We disagree.

The record reveals that the trial court did not in any way limit or restrict Rabalais in presenting evidence pertaining to Brouillette's ability to pay. Even at that, the evidence shows that at the time of trial, Brouillette was gainfully employed and could hardly be classified as a pauper. Of more importance, the trial court adequately instructed the jury that in assessing damages, consideration should be given to Brouillette's ability to pay. In fact, with the exception of the changing of one word, the instruction given the jury by the court was identical to the instruction proposed by Rabalais.[4] Moreover, counsel for Rabalais was allowed to thoroughly argue this issue in closing arguments with counsel taking that opportunity to fully explain to the jury the instructions on the issue of ability to pay ultimately given by the court. Under the

---

YES_____          NO_____

10.     If your answer to question number 9 was "No", please state the amount of the total
        judgment that you believe could have been paid by Herbert Patrick Brouillette.

$_____

[4] The instruction given the jury on the ability to pay was as follows:

> It is well settled in our law that the financial ability of a defendant to pay is a circumstance which must be *considered* in assessing an award for damages, both general and special. When ability to pay is considered, plaintiff may only be compensated to the degree that it does not impose an undue hardship on the defendant. If you award damages you must consider how much of that figure could actually have been paid by Herbert Brouillette. (Emphasis added.)

> The only difference in the actual instruction and the instruction proposed by Rabalais is in the first sentence. The word "considered" was used by the court instead of the word "determined," as proposed by Rabalais. This difference is immaterial.

circumstances, we are of the opinion the jury was fully and adequately apprised of the issue of Brouillette's alleged inability to pay.

Rabalais also argues that the Brouillette damages awarded by the jury were excessive. Defendant is correct that none of the Plaintiffs suffered any physical injuries as a result of the Brouillette attack. It is also true that the medical treatment received by the Plaintiffs for their emotional distress or injuries was minimal. Moreover, there is no definitive evidence that any of the Plaintiffs will suffer any long term effects from the traumatic episode wrought by Mr. Brouillette.

The circumstances of this case, however, do not neatly fit into a normal damage model. One cannot turn to prior jurisprudence and easily find guidelines for gauging in dollars the horrific ordeal endured by the Plaintiffs in the wee hours of the morning of July 2, 1997.

The Plaintiffs were jolted out of deep slumber that morning by the sounds of gunfire and the sounds of bullets and shotgun pellets ripping into their home. As they cringed in the darkness, Amanda and Vincent also began hearing the shouts of their father and Brouillette as they exchanged gunfire, fearing that at any moment their father would be shot.

During the course of this raid on the Chatelain home, none of the Plaintiffs had any idea how many people were involved in the attack. They all had the genuine fear that it could be just a matter of time before the attacker or attackers succeeded in storming into their once peaceful home. They all were facing the grim doorway of death.

While there is no question of Jonathan's bravery in defending his home and family, there can be no question either that his was a terrifying experience. In order for Jonathan to have any hope of successfully firing his weapon at Brouillette,

6

Jonathan necessarily had to expose himself to the gunfire from Brouillette. Jonathan also knew that his wife and children would be essentially helpless if he were to be shot by Brouillette or whomever else might have been out there in the darkness.

The record shows that Jonathan sought help from Dr. Paul Ware, a psychiatrist[5]. Anti-depressants were prescribed. Dr. Ware felt that Jonathan had a mild clinical depression prior to the shooting event, the symptoms of which were increased as a result of the event. Dr. Ware diagnosed dysthymic mood disorder with associated anxiety, and noted that following the incident, Jonathan no longer felt safe. For the first time, Jonathan began locking his doors, putting up motion lights, and he installed an alarm system. He kept a loaded gun next to his bed and was preoccupied with the incident and kept thinking about it over and over again. Jonathan reported difficulty in initiating and doing things. Dr. Ware noted that the incident affected Jonathan's basic belief system with regard to things such as trust in others. The doctor stated that Jonathan had a marked increase in feelings of sadness, was tired, and was having difficulty functioning when he came for treatment. He noted that marital discords between Jonathan and his wife increased after the incident with the result that the two finally separated. Dr. Ware opined that Jonathan continued to show mild residual effects from the traumatic experience and that Jonathan would need further treatment for approximately the next two years after his visit on June 13, 2000, prior to Dr. Ware's deposition.

Amanda was treated on one occasion by Dr. John Simoneaux, a clinical psychologist. Dr. Simoneaux's testimony indicates that Amanda had a variety of other stressors in her life in addition to the shooting event, including discord with her

_____

[5] Dr. Ware's deposition was taken in July 2000 and read into the record of the trial which was held in July 2003. A summary of charges for Dr. Ware's services shows that all three Chatelain's continued to see him following his deposition.

7

parents, unhappiness with her work and problems with her boyfriend and his family. He concluded that the shooting event had not profoundly affected her. She also saw Dr. Ware a total of four times from April 1999 through June 2003. Dr. Ware testified that he diagnosed Amanda as suffering from adjustment disorder of adulthood with anxiety and depression and some features of post-traumatic stress disorder. He stated that she was particularly affected by her concern for her father, with whom she was close. He also noted that she had started to be more worried and suspicious in her relationship with her boyfriend, and had difficulty concentrating in school. Dr. Ware prescribed an anti-depressant medication but Amanda found that the medication caused nausea and took it only once. The doctor felt that she had regained her emotional equilibrium by the last time he saw her.

Vincent also saw Dr. Ware, who opined that Vincent was not as affected by the incident as his father and sister. The doctor testified that when he saw Vincent he had only a mild lingering symptom in that when he was home and he heard an unexpected noise outside he would feel uneasy and the need to check it out. Dr. Ware did not suggest further treatment for Vincent. Vincent was also seen once by Dr. Simoneaux, who found him to be a well-functioning adolescent and saw no need for further treatment.

The agony and anguish suffered by the Chatelains during this brutal invasion of their home are insusceptible to precise measurement. If ever a case was perfectly suited for having damages determined by a jury of one's peers, this is that case.

We find no error in the award to the Plaintiffs of general damages as a result of the actions of Brouillette.

Brouillette Special Damages:

Under the category of the special damages, the jury awarded each Plaintiff the same amount, $5,000.00. The only special damages proven, or attempted to be proven, were the medical expenses incurred or to be incurred by the Plaintiffs. These medical expenses related to charges made or to be made by Drs. Simoneaux and Ware.

Special damages, unlike general damages, are susceptible of being established with reasonable mathematical certainty. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70; *Myers v. Broussard*, 96-1634 (La.App. 3Cir. 5/21/97), 696 So.2d 88 . "Future medical expenses are an element of special damages that must be proven with certainty based on medical testimony concerning the requirement of such expenses and their probable cost." *Netecke v. State*, 97-974, p. 15 (La.App. 3 Cir. 4/1/98), 715 So.2d 439, 448; *writs granted,* 98-1182, 98-1197 (La. 6/26/98), 719 So.2d 485, *reversed on other grounds,* 98-1197 (La. 10/19/99), 747 So.2d 489. See also *Gagnard v. Zurich American Ins. Co. of America,* 02-19 (La.App. 3 Cir. 6/12/02), 819 So.2d 489. Further, to recover medical expenses, whether past or future, a plaintiff must show, through medical testimony, both the existence of the injury and a causal connection between the injuries and the incident of which plaintiff complained. *Rhodes v. State, DOTD*, 94-1758 (La.App. 1 Cir. 1996), 684 So.2d 1134, *writ denied*, 97-0242 (La. 2/7/97), 688 So.2d 487.

Dr. Simoneaux was engaged to examine the Plaintiffs while Rabalais was still representing them. However, he saw only Amanda and Vincent on one occasion each. His charges were $500.00 for each visit. After current counsel assumed representation of Plaintiffs, counsel arranged for them to be seen by Dr. Ware. Although the record is not as definitive as it could be, it appears that as of the day of the trial Dr. Ware had charged $800.00 for seeing Jonathan, $900.00 for Amanda and $500.00 for Vincent.

Dr. Ware testified that he saw no need for any further visits or treatment of Amanda and Vincent. The doctor did say, in his deposition of July 2000, that Jonathan should visit him four or five times within two years of his last visit at a total cost of some $500.00. Jonathan's testimony at the trial in July 2003, suggests that this additional treatment had been completed at that time.

Accordingly, the only proven specials were $1,300.00 for Jonathan, $1,400.00 for Amanda and $1,000.00 for Vincent. "[T]he manifest error standard controls on the issue of the assessment of special damages. *Johnson v. State Through Department of Public Safety and Corrections*, 95-0003 (La.App. 1 Cir. 10/6/95), 671 So.2d 454." *Craige v. Broome*, 03-0255, p. 11 (La.App. 4 Cir. 2/25/04), 869 So.2d 242, 246. Given the evidence with regard to special damages, it appears that the jury did err manifestly in its award of special damages. As a result, this court must determine the appropriate amount of special damages from a *de novo* review of the record. *Bennett v. State Farm Ins. Co.*, 03-1195 (La.App. 3 Cir. 3/24/04), 869 So.2d 321.

We find that the record would justify an award of special damages of no more than $1,500.00 for Jonathan, $1,500.00 for Amanda and $1,200.00 for Vincent.

RABALAIS DAMAGES

After completing the interrogatories pertaining to the Brouillette damages, the jury was given additional interrogatories to determine whether Rabalais deviated below the standard of care required of an attorney and, if so, whether the Plaintiffs suffered damages as a result of this deviation. The jury found there was such a deviation and awarded Plaintiffs the identical amount previously awarded due to the

10

actions of Brouillette, including the same amount awarded each Plaintiff for special damages.[6]

Rabalais General Damages:

While we are of the opinion that the jury award for the Brouillette damages is supported by the record, we have great difficultly finding evidentiary support for awarding an amount identical to the Brouillette damages for what Rabalais did or did not do.

Able counsel for the Plaintiffs points out a number of alleged deficiencies in Rabalais' representation of the Plaintiffs, both before and after the underlying case had prescribed. Counsel argues that before the case prescribed, Rabalais failed to properly

---

[6] Interrogatories 9,10 & 11 pertain to the Rabalais damages and, as completed by the jury, read as follows:

9)      If you found in question #1 that Defendant, Rodney Rabalais deviated below the standard of care required of an attorney, did Jonathan Chatelain suffer any damages as a result of this deviation?

               /
            Yes                                    No

If yes, what sum of money would reasonably and fairly compensate Jonathan Chatelain?

a)      General Damages       $   45,000.00
b)      Special Damages       $    5,000.00

10)     If you found in question #1 that Defendant, Rodney Rabalais deviated below the standard of care required of an attorney, did Amanda Chatelain suffer any damages as a result of this deviation?

             /
          Yes                                    No

If yes, what sum of money would reasonably and fairly compensate Amanda Chatelain?

a)      General Damages       $   20,000.00
b)      Special Damages       $    5,000.00

11)     If you found in questions #1 that Defendant, Rodney Rabalais deviated below the standard of care required of an attorney, did Vincent Chatelain suffer any damages as a result of this deviation?

            /
         Yes                                    No

If yes, what sum of money would reasonably  and fairly compensate Vincent Chatelain?

a)      General Damages       $   20,000.00
b)      Special Damages       $    5,000.00

11

investigate the facts and prepare the case for trial. After prescription had run, counsel complains that Rabalais was slow in advising Plaintiffs of this error; that Rabalais did not timely advise Plaintiffs that Rabalais had actually filed a suit against Brouillette, albeit past the prescription date; that Rabalais communicated only with Lauren about his mistake and avoided doing so with Jonathan; and that Rabalais' letter formally notifying Plaintiffs of his error, was sent more than 90 days after the underlying case had prescribed. While counsel is to be commended for ferreting out these alleged deficiencies, with the possible exception of Jonathan, they did not seem to inflict material emotional distress upon the Plaintiffs.

It is to be noted also that Rabalais never denied his negligence, never was defiant in the defense of himself, and never tried to shift blame to someone else. In his contacts with the Plaintiffs after the case prescribed, as well as during the trial of this case itself, he was contrite and apologetic. This attitude of humility would tend to soothe mental distress rather than engender it.

In his testimony, Jonathan made it quite clear that he was considerably upset with Rabalais. Most of Jonathan's displeasure centered on the fact that after the case prescribed, Rabalais communicated with Lauren rather than Jonathan. It seems that Lauren and Rabalais had been friends for sometime, both being members of the same Rotary Club. Although there was no evidence of any improper relationship between Rabalais and Lauren, Jonathan indicated that whatever that relationship was, it contributed to his divorce from Lauren. Jonathan even suggested that Rabalais had "sold us out" because Brouillette was related to a political figure in Avoyelles Parish.

There is no question that Jonathan was very angry with Rabalais and that this anger persisted at least through the trial of this case. Anger is certainly a form of emotional distress. In determining whether emotional distress rises to the level of

12

being compensable in damages, great weight must be given to the medical evidence or testimony on the issue. Importantly, Dr. Ware testified at length about Jonathan's mild clinical depression and the causes of same. The doctor's testimony sets forth in detail Jonathan's emotional difficulties relating to the Brouillette incident. However, nowhere in Dr. Ware's testimony does he mention any emotional trauma or distress suffered by Jonathan attributable to the actions or inactions of Rabalais. Not only did Dr. Ware fail to address any emotional trauma suffered by Jonathan caused by Rabalais, no questions were posed to Dr. Ware on this issue by counsel.

While the evidence is slim regarding the injuries to Jonathan resulting directly from Rabalais' fault, the evidence of emotional injuries to Amanda and Vincent caused by Rabalais is non-existent. Neither Amanda nor Vincent gave any testimony that either had suffered meaningful distress as a result of Rabalais' fault or negligence. The best they could offer was that neither of them had real contact with Rabalais. Amanda was seen once by Dr. Simoneaux and twice by Dr. Ware. Vincent was seen by Dr. Simoneaux and by Dr. Ware. Neither doctor made mention in his testimony of any difficulties at all suffered by Amanda or Vincent resulting from anything done or not done by Rabalais.

Again, the jury awarded each Plaintiff an identical sum for damages caused by Brouillette and those cause by Rabalais. In comparing the ample evidence of the chilling horror of the Brouillette incident with the paucity of evidence relating to emotional injuries caused by Rabalais, we are of the opinion that the jury must have been confused in awarding the same amount in Rabalais damages as the Brouillette damages. While the trial court has a great deal of discretion to determine whether to submit interrogatories to the jury and the exact content and wording of the

13

interrogatories submitted,[7] "Misleading or confusing interrogatories, or interrogatories which do not adequately set forth the issues to be decided by the jury, may constitute reversible error." *Campbell v. Hospital Service Dist. No. 1 Caldwell Parish*, 37,876, p. 6 ( La.App. 2 Cir. 12/10/03), 862 So.2d 338, 344, *writ denied*, ___So.2d ___ (La. 3/19/04). However, a verdict based on the interrogatories should not be set aside unless the form prevented the jury from reaching a legally correct verdict. *Id.* At trial, counsel for Defendant objected to the failure to give his requested interrogatories with regard to ability to pay, but he did not object on the grounds of the possibility of the jury being confused. Rabalais, however, does make this argument in his brief to this court. "[W]hen jury instructions or interrogatories contain a 'plain and fundamental' error . . . the contemporaneous objection requirement is relaxed and appellate review is not prohibited." *Campbell*, 862 So.2d at 344. In this case, the evidence supports the conclusion that the jury interrogatories and instructions were confusing and thus fundamentally in error.

In addition to the great disparity in the evidence attributable to these two categories of damages, there are other notable factors indicating the confusion of the jury.

First, during deliberations the jury sent a message to the court asking for further instructions. Unfortunately, the record does not reveal the specific issue with which the jury was concerned. The record does reflect the trial court and the attorneys discussed this request by the jury at some length, but there is no indication that the jury was ever given a response by the court. Although we do not know the specific

---

[7] *Young v. First Nat. Bank of Shreveport*, 34,214 ( La.App. 2 Cir. 8/22/01), 794 So.2d 128, *writs denied*, (La.1/4/02), 805 So.2d 209, 1195, *reconsideration granted, writ denied*, (La. 3/22/02) 811 So.2d 936.

nature of the jury's inquiry to the court, this does suggest that the jury was confused about something.

Second, there is nothing in the interrogatories given to the jury nor in the instructions given the jury by the trial court, explaining the difference between the Brouillette damages and the Rabalais damages. At no time was the jury advised that the Rabalais damages were to be determined and assessed separate and distinct from the Brouillette damages.

Third, it is also telling that the jury awarded the identical amount of special damages caused by Brouillette and by Rabalais. As indicated above, the only special damages proven were the costs of the medical treatment afforded or to be afforded by Drs. Simoneaux and Ware. Again, these proven medical expenses were considerably less than the special damages awarded by the jury *in either* the Brouillette or Rabalais categories of damages. Also, it is to be reiterated that neither Dr. Simoneaux nor Dr. Ware testified that any of the Plaintiffs' injuries was caused by Rabalais. To be sure, whatever special damages were proven, they can only be awarded once.

Fourth, in answering the appeal in this case, Plaintiffs seek an increase in the damage award. However, this increase is sought only for the damages caused by Brouillette, there being no request for an increase in the Rabalais damages. At the very least, this is a strong indication that Plaintiffs themselves see the Brouillette damages as being significantly greater than the Rabalais damages.

We find that the failure to include in the interrogatories, or in the instructions to the jury an explanation of the need to separately calculate the two elements of damages, those arising solely from Brouillette's actions and those arising solely from the actions or inactions of Rabalais, misled and confused the jury. *See Campbell*, 862 So.2d 338.

15

As to Amanda and Vincent, the record is totally devoid of any evidence supporting an award to them for the Rabalais damages. Accordingly, we reverse entirely the general damage awards to Amanda and Vincent in the Rabalais damages. Although the award of general Rabalais damages to Jonathan was not supported by medical testimony or evidence, we cannot say there is insufficient lay testimony to support some award to Jonathan in this category. The trier of fact is to be accorded a great deal of discretion in making awards of general damages. Because of this vast discretion an appellate court should rarely disturb an award of general damages. However, if an award beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, the appellate court will increase the award to the lowest point within the discretion of the court or decrease it to the highest point within the discretion of the court. *Adams v. Chenault*, 36,729 (La.App. 2 Cir. 1/29/03), 836 So.2d 1193, *Pullen v. Ziegler*, 562 So.2d 1093,1095(La.App. 4 Cir. 1990). We are of the opinion that the highest award justified by the evidence to be awarded to Jonathan for Rabalais general damages would be $5,000.00.

Rabalais Special Damages:

The only special damages proven were the medical expenses and future medical expenses addressed above in the discussion of the Brouillette damages. No other special damages were proven and no attempt was made to separate the special damages attributable to Brouillette and those attributable to Rabalais. Accordingly, we reverse the award of special damages to each of the Plaintiffs in the Rabalais category of damages.

CONCLUSION

16

For these reasons, the judgment of the trial court is affirmed in part, reversed and rendered in part, the awards to each Plaintiff being as follows:

Jonathan Rabalais:

| | |
|---|---|
| Broullette General Damages:   Affirmed | $45,000.00 |
| Rabalais General Damages: | $ 5,000.00 |
| Brouillette Special Damages: | $ 1,500.00 |
| Rabalais Special Damages: | $       00.00 |
| Total : | $56,000.00 |

Amanda:

| | |
|---|---|
| Brouillette General Damages:  Affirmed | $20,000.00 |
| Rabalais General Damages: | $      00.00 |
| Brouillette Special Damages: | $ 1,500.00 |
| Rabalais Special Damages: | $      00.00 |
| Total: | $21,500.00 |

Vincent:

| | |
|---|---|
| Brouillette General Damages:  Affirmed | $20,000.00 |
| Rabalais General Damages: | $      00.00 |
| Brouillette Special Damages: | $ 1,500.00 |
| Rabalais Special Damages: | $      00.00 |
| Total: | $21,500.00 |

Costs of this appeal are to be paid one-half by the Appellant and one-half by the Appellees.

**AFFIRMED IN PART, REVERSED IN PART AND RENDERED.**

17